*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0102p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

BRENTWOOD ACADEMY,

*Plaintiff-Appellee/*
*Cross-Appellant,*

v.

TENNESSEE SECONDARY SCHOOL ATHLETIC
ASSOCIATION; RONNIE CARTER, Executive Director
and in his individual capacity,

*Defendants-Appellants/*
*Cross-Appellees.*

Nos. 03-5245/5278

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 97-01249—Todd J. Campbell, District Judge.

Argued: December 7, 2004

Decided and Filed: March 17, 2006

Before: GIBBONS and ROGERS, Circuit Judges; BELL, Chief District Judge.[*]

---

**COUNSEL**

**ARGUED:** Richard L. Colbert, COLBERT & WINSTEAD, Nashville, Tennessee, for Appellants.
James F. Blumstein, VANDERBILT LAW SCHOOL, Nashville, Tennessee, for Appellee.
**ON BRIEF:** Richard L. Colbert, W. Gregory Miller, J. Christopher Anderson, COLBERT &
WINSTEAD, Nashville, Tennessee, for Appellants. James F. Blumstein, VANDERBILT LAW
SCHOOL, Nashville, Tennessee, H. Lee Barfield II, W. Brantley Phillips, Jr., BASS, BARRY &
SIMS, Nashville, Tennessee, for Appellee. Daniel Casse, WHITE HOUSE WRITERS GROUP,
Washington, D.C., Chester E. Finn, Jr., THOMAS B. FORDHAM FOUNDATION, Washington,
D.C., John F. Daly, FEDERAL TRADE COMMISSION, Washington, D.C., William E. Quirk,
James M. Humphrey, SHUGHART, THOMSON & KILROY, Kansas City, Missouri, for Amici
Curiae.

GIBBONS, J., delivered the opinion of the court, in which BELL, Chief D. J., joined.
ROGERS, J. (pp. 27-37), delivered a separate dissenting opinion.

---

[*]The Honorable Robert Holmes Bell, Chief United States District Judge for the Western District of Michigan,
sitting by designation.

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge.  This appeal represents the third trip to this court for the parties to this litigation.  The case has also been before the United States Supreme Court, which made a notable ruling that defendant-appellant Tennessee Secondary School Athletic Association ("TSSAA") was a state actor.

The parties' dispute began when the TSSAA imposed a number of penalties on plaintiff-appellee Brentwood Academy ("Brentwood") as a result of asserted violations by Brentwood of the TSSAA's rule governing recruiting of student athletes.  Brentwood sued the TSSAA and its executive director, defendant-appellant Ronnie Carter, alleging violations of the First and Fourteenth Amendments, federal antitrust laws, and Tennessee law.  After the United States Supreme Court determined that the TSSAA is a state actor, this court on remand held that the recruiting rule was content-neutral and subject to intermediate scrutiny.  We remanded to the district court with instructions about the proper analysis in the case on the First Amendment issue.  The district court conducted a ten-day nonjury trial.  The district court found for Brentwood on the First Amendment issue, holding that the application of the rule to Brentwood was not narrowly tailored to further the TSSAA's legitimate, substantial interests.  The district court also found for Brentwood on its substantive and procedural due process claims against the TSSAA, as well as on its procedural due process claim against Carter in his individual capacity.  The district court enjoined the TSSAA's penalties against Brentwood.  The district court also held that the TSSAA was entitled to immunity from Brentwood's antitrust claims.  The parties cross-appealed to this court on these issues.

For the reasons set forth below, we affirm in part, reverse in part, and remand for further proceedings.

**I.**

**A. Factual Overview**

We begin with a description of the most pertinent facts and supply additional facts as necessary in our discussion of the various issues.

The TSSAA is a voluntary association of 290 public schools and 55 independent and parochial schools from across the state of Tennessee.  The TSSAA is organized as a non-profit corporation under Tennessee law, with the purpose of stimulating and regulating interscholastic athletic competition among its member schools.  Its governing entity is the Board of Control.  As noted in the Supreme Court's decision in this case, the Tennessee State Board of Education, beginning in 1925, explicitly acknowledged the TSSAA's functions "in providing standards, rules and regulations for interscholastic competition in the public schools of Tennessee."  *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 292 (2001).  In 1972, the Board designated the TSSAA as "the organization to supervise and regulate" interscholastic athletics and specifically approved the TSSAA's rules and regulations, including the recruiting rule.  *Id*.  In 1996, the Board dropped the rule expressly designating the TSSAA as regulator but did not change its relationship with the organization.  *Id*. at 292-93.  At all times relevant to the present case, Ronnie Carter served as executive director of the TSSAA.

Brentwood Academy is an independent school in Brentwood, Tennessee, and a member of the TSSAA.  In 1998, the school had about 520 students in grades six through twelve.  Brentwood's athletic teams, especially its football team, have been very successful in interscholastic competitions,

even though its enrollment is smaller than many of its competitors. At the time of the events in question, Brentwood's Headmaster was Bill Brown; the Athletic Director and Head Football Coach was Carlton Flatt; and the Director of Admissions was Nancy Brasher. Brentwood paid a fee to the TSSAA to renew its membership on an annual basis.

The TSSAA has promulgated a "recruiting rule" in order to regulate the attempts of secondary schools to recruit middle school student athletes for athletic programs. The rule, found in the TSSAA's Bylaws, reads:

> The use of undue influence on a student (with or without an athletic record), his or her parents or guardians of a student by any person connected, or not connected, with the school to secure or to retain a student for athletic purposes shall be a violation of the recruiting rule.

The bylaws also include a number of questions and answers and other guidelines that are known as interpretive commentary. While these are meant to aid in the interpretation of the recruiting rule, they are not binding on the TSSAA Board of Control. Carter agreed that the recruiting rule itself is "all that really counts, everything else underneath it, the interpretative commentary is discretionary and it depends on the totality of the circumstances."

Excerpts from the interpretive commentary include the following:

> 1.
>
> Q. How is undue influence interpreted in the recruiting rule?
>
> A. A person or persons exceeding what is appropriate or normal and offering an incentive or inducement to a student with or without an athletic record.
>
> ...
>
> 3.
>
> Q. Is it permissible for a coach to contact a student or his or her parents prior to his enrollment in the school?
>
> A. No, a coach may not contact a student or his or her parents prior to his enrollment in the school. This shall apply to all students whether or not they have an athletic record.
>
> 4.
>
> Q. What are some of the guides [sic] used in determining whether there has been undue influence used which would result in a violation of the recruiting rule?
>
> A. Some examples are, but not limited to:
>
> > 3. Any initial contact or prearranged contact by a member of the coaching staff or representative of the school and a prospective student/athlete enrolled in any member school except where there is a definite feeder pattern.
> >
> > 4. Any initial contact or prearranged contact by a member of the coaching staff or representative of the school and a prospective student/athlete in the seventh grade and above at any non-member school except where there is a definite feeder pattern involving the schools.

> ...
>
> Private...schools may not contact students enrolled at the public schools. Public schools may not contact students enrolled at the private schools.
>
> ...
>
> 7. Admitting students to athletic contests free of charge when there is an admission being charged at the contest except where there is a definite feeder pattern involved with the school.

The "definite feeder pattern" exception does not apply to Brentwood, except with regard to those students who are enrolled at Brentwood Academy itself in the sixth grade or higher.

In some form, the recruiting rule has been in effect at least since the early 1950s and probably earlier. It has undergone various changes; the auxiliary questions and answers and guidelines were added during the 1980s and 90s.

In 1997, a number of coaches at public high schools that were TSSAA members reported various alleged recruiting violations by Brentwood to the TSSAA. On behalf of the TSSAA, Carter and other TSSAA officials began an investigation into the allegations. During the investigation, Brentwood supplied Carter with a copy of a letter Flatt sent to various eighth grade boys in April 1997 as well as information regarding phone calls Flatt made to the families of the boys to whom the letter was sent. The letter read, in part:

> Having officially enrolled at Brentwood Academy, the TSSAA allows you to participate in spring football practice. If you are not currently involved in a sport at your school, we would like to invite you to practice with your new team.... Due to the inconvenience to your parents, please do not feel that you must attend every practice. However, I do feel that getting involved as soon as possible would definitely be to your advantage.... We are certainly glad that you decided to become an *Eagle*.

The letter was signed, "Your Coach, Carlton Flatt." This letter was sent to all incoming ninth grade male students who had applied, been tested and admitted, and signed enrollment contracts with Brentwood.[1] Flatt testified that after the letter was mailed, he received "a couple of phone calls" from parents of boys who received the letter with questions about the letter and the necessity of the boys attending practice. As a result of these calls, Flatt decided to call each of the families of the boys who received the letter to clarify that the spring practice was not mandatory and should not trump any other academic or athletic responsibility the boys might have. All twelve boys who received the letter ended up attending spring practice.

---

[1]Headmaster Brown later testified that those students who sign such contracts (and paid the accompanying $300 deposit), in his mind, were officially enrolled at Brentwood and committed to come. The TSSAA, however, contends that the term "enrolled" (as used in the recruiting rule) is defined in the TSSAA Bylaws, under Article II (Eligibility Rules), Section 1 (Academic Rules):

> To be eligible to participate in athletic contests during any semester....
> (b) Students shall be regularly enrolled, in regular attendance, and carrying at least five full courses. A student shall be considered as regularly enrolled after the student has attended for three days, has engaged in three or more days of football, girls volleyball, cross country, golf or girls soccer practice during the period on or after August 1, or has participated in an athletic contest in any sport.

There was some testimony at trial indicating that a few students every year do not end up attending Brentwood even after signing the enrollment contracts.

The TSSAA also investigated allegations that tickets for a Brentwood football game provided by Flatt to a middle school coach were used by some of the coach's student athletes to attend the game for free. As the TSSAA put it, these tickets were "made available to uncontrolled individuals" in a way that facilitated "the possibility for abuse." Flatt later testified that he had told the coach that the tickets were not to be used to provide free admission to middle school students. The middle school coach nonetheless allowed two of the free tickets to be used by two of his students.

Carter notified Brentwood by letter dated July 29, 1997, that the TSSAA had found Brentwood guilty of multiple violations of TSSAA rules. The letter informed Brentwood of various penalties that would be assessed as a result of the rules violations. Brentwood requested a hearing with Carter and members of the TSSAA Board of Control; a hearing was held on August 13, 1997, at which Headmaster Brown and representatives of Brentwood made a presentation regarding the allegations and determinations in the July 29 letter. Following the hearing, Carter again sent a letter to Brown providing more specific information about the violations and penalties to be assessed against Brentwood. Pursuant to the TSSAA Bylaws, Brentwood appealed the penalties to the full Board of Control, which is charged with enforcing the TSSAA Bylaws. Another hearing was held on August 23, 1997. In an August 23, 1997, letter that represented the final TSSAA decision on the matter, the Board notified Brentwood that it had found that Brentwood, and specifically Flatt, violated the recruiting rule in two ways: (1) by granting free admission to a Brentwood football game to two eighth grade athletes from another school; and (2) by sending letters and making phone calls to eighth grade boys at other schools regarding spring football practice at Brentwood.[2] The Board also cited Brentwood for conducting impermissible off-season practice with certain Brentwood student-athletes, but this alleged rule violation is not an issue in this appeal. As a result of these violations, the Board imposed numerous penalties, including a four-year probation for Brentwood's entire athletic program, suspension of playoff eligibility for the Brentwood football and boys' basketball teams, and a $3,000 fine.

### B. Procedural History

Brentwood sued the TSSAA and Carter (in his official and individual capacities) on December 12, 1997, alleging that the TSSAA violated the First and Fourteenth Amendments; the Sherman Act, 15 U.S.C. §§ 1-2; and Tennessee law. On July 29, 1998, the district court found that the TSSAA and Carter were state actors and granted summary judgment to Brentwood on its First Amendment claim brought under 42 U.S.C. § 1983. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 13 F. Supp. 2d 670 (M.D. Tenn. 1998). The TSSAA appealed that decision, and the Sixth Circuit reversed, on the basis that the TSSAA is not a state actor and thus not subject to suit under § 1983. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 180 F.3d 758 (6th Cir. 1999). The United States Supreme Court granted certiorari and reversed the Sixth Circuit, holding that "the association's regulatory activity may and should be treated as state action owing to the pervasive entwinement of state school officials in the structure of the association." *Brentwood Acad.*, 531 U.S. at 291.

On remand from the Supreme Court, this court considered the merits of the TSSAA's appeal. This court reversed the decision of the district court granting summary judgment to Brentwood and remanded the case to the district court, holding that: (1) Brentwood did not waive its right to challenge the recruiting rule by voluntarily joining the TSSAA; (2) the recruiting rule is not facially overbroad; and (3) the district court erred by subjecting the recruiting rule to strict scrutiny, because

---

[2]To be clear, the alleged violation of the recruiting rule was the *invitation* to attend football practice, not the practice itself. It is undisputed that in 1997, participation by incoming Brentwood students in spring football practice was permissible under TSSAA rules. The rule was subsequently changed to prohibit such participation.

it is content-neutral. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 262 F.3d 543 (6th Cir. 2001). This court remanded to the district court with instructions to: (1) determine whether the TSSAA's asserted substantial state interests for the recruiting rule were legitimate; (2) determine whether the application of the rule to Brentwood was narrowly tailored to further the TSSAA's legitimate state interests; and (3) address Brentwood's claims against Carter in his official and individual capacities. *Id*. at 558.

After remand and prior to trial, on October 25, 2002, the district court granted partial summary judgment to defendants on Brentwood's antitrust claims, reasoning that since TSSAA is an organization "pervasively entwined" with the state, it is entitled to antitrust immunity under *Parker v. Brown*, 317 U.S. 341 (1943).

In December 2002, the district court held a bench trial and considered the issues addressed by this court in its 2001 opinion, as well as Brentwood's substantive due process, procedural due process, equal protection, and Tennessee state law claims. The court issued a memorandum opinion and order on January 13, 2003, finding: (1) for Brentwood on its First Amendment, substantive due process, and procedural due process claims against the TSSAA; (2) for Brentwood on its procedural due process claim against Carter in his individual capacity; and (3) for Carter with regard to Brentwood's First Amendment and substantive due process claims against Carter in his individual capacity. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 304 F. Supp. 2d 981 (M.D. Tenn. 2003). The court held that Carter was not entitled to qualified immunity on Brentwood's procedural due process claim but that he would be entitled to qualified immunity on Brentwood's First Amendment claim. The court declined to reach the equal protection or state law claims, and it refused to award damages to Brentwood. As relief for Brentwood, the court enjoined the penalties imposed by the TSSAA against Brentwood in 1997.

On February 10, 2003, the TSSAA and Carter appealed the January 13, 2003, order to this court. On February 24, 2003, Brentwood cross-appealed, taking issue with: (1) the district court's October 2002 order granting partial summary judgment to defendants on the antitrust claims; and (2) the relief provisions of the January 13, 2003, order.[3]

## II. Analysis of the Issues

This court reviews a district court's findings of fact for clear error. *See Waxman v. Luna*, 881 F.2d 237, 240 (6th Cir. 1989). However, conclusions of law, questions of mixed law and fact, and "findings of ultimate facts which result from the application of legal principles to subsidiary factual determinations" are all subject to *de novo* review. *Id*. (citation and quotation marks omitted); *see Cordrey v. Euckert*, 917 F.2d 1460, 1465 (6th Cir. 1990).

### A. The TSSAA's Reliance on Its Contractual Relationship with Its Members

Permeating the TSSAA's arguments[4] on both the First Amendment and due process issues is its contention that rulings by the district court "ignored the constitutionally critical fact that the relationship between TSSAA and [Brentwood] arose entirely from a membership contract that [Brentwood] renewed each year." In other words, according to the TSSAA, "[e]very argument of

---

[3]Brentwood did not appeal the district court's conclusions regarding Brentwood's equal protection or state law claims. Nor did it appeal the district court's dismissal of Brentwood's First Amendment and substantive due process claims against Carter in his individual capacity.

[4]For the sake of convenience and clarity, we refer to the defendants collectively as "TSSAA" throughout this section of the opinion.

[Brentwood] and every ruling by the District Court relies [sic] on the false premise that TSSAA is the sovereign State exercising police power rather than a state actor that asks its members to honor its voluntary contractual obligations." Prior to undertaking analysis of the First Amendment claim, we must address this argument as it relates to that claim.

There is a short answer to the TSSAA's argument with regard to the First Amendment claim. The answer is that it is inconsistent with the law of the case and this court's 2001 opinion. In the 2001 opinion this court outlined the First Amendment analysis to be employed by the district court on remand. *See Brentwood Acad.*, 262 F.3d at 557-58. The underpinning of that analysis is that the TSSAA's role in this case is that of a governmental entity exercising regulatory authority and that the recruiting rule must be considered a content-neutral rule subject to intermediate scrutiny. The court noted with particularity that the recruiting rule was analogous to zoning ordinances and limitations on noise, posting of signs, and distribution of religious literature that have been upheld as reasonable time, place, and manner restrictions. *Id*. at 553-54. The panel in the 2001 decision instructed the district court on remand to determine whether the recruiting rule is narrowly tailored to meet TSSAA's substantial interests. *Id*. at 558. It noted that this question could not be decided in the abstract as a matter of law and contemplated that TSSAA would present evidence to justify the need for its regulations. *Id*. The panel was quite clear in outlining the district court's task on remand.

The TSSAA's reasoning invites us to stray from the 2001 panel's road map and follow another analytical route it deems more favorable to its position. In making its argument, it suggests that two lines of First Amendment cases – unconstitutional conditions cases represented by cases such as *Board of County Commissioners v. Umbehr*, 518 U.S. 668 (1996), and government employee speech cases such as *Pickering v. Board of Education*, 391 U.S. 563 (1968) – provide the correct analytical framework. Both lines of cases were mentioned by the panel in its 2001 opinion but in a context different from that in which the TSSAA now urges that they apply.

One argument made by the TSSAA in 2001, bearing substantial resemblance to its present position, was that Brentwood "waived its right to question the constitutionality of the recruiting rule because, by voluntarily choosing to be a member of TSSAA, it has agreed to abide by the rules of the organization." *Brentwood Acad.*, 262 F.3d at 549. This court rejected that argument, reasoning that "the Supreme Court's rulings that parties do not give up First Amendment rights by contracting with, or being employed by, a public agency forecloses [sic] TSSAA's argument that Brentwood gave up its right to challenge the constitutionality of the recruiting rule because it voluntarily joined TSSAA." *Id*. at 550-51 (citing *Umbehr* and *Pickering*). While *Umbehr* and *Pickering* may have given guidance in disposing of the waiver argument, the 2001 opinion in no way indicates that they govern the analysis on remand as to whether the TSSAA's application of the recruiting rule to Brentwood violated its First Amendment rights.

Our agreement or disagreement with the 2001 panel decision is not at issue here. We have no authority to overturn a prior published decision of this court, *see Darrah v. City of Oak Park*, 255 F.3d 301, 309 (6th Cir. 2001), and, moreover, that decision is the law of the case, *see Scott v. Churchill*, 377 F.3d 565, 569-70 (6th Cir. 2004). While courts have some discretion in following the law of the case doctrine, *see id*. at 570, this protracted and contentious litigation presents a compelling situation for its application. In order to maintain the integrity of the judicial process, an appellate court cannot change its mind as to the proper analysis after it has remanded a case for trial and the district court has tried it, giving its best effort to adhere faithfully to the appellate court instructions. We should properly review the district court's decision, but we cannot change the rules after the fact. *See United States v. Campbell*, 168 F.3d 263, 265 (6th Cir. 1999) ("Determinations of the court of appeals of issues of law are binding on both the district court on remand and the court of appeals upon subsequent appeal."). This stance properly defers to the precedent set by the prior

panel and recognizes that the parties and the district court must be able to rely on this court's prior rulings in trying the case.[5]

While this court's 2001 ruling provides the definitive answer to the First Amendment argument based on the TSSAA's contractual relationship with its members, we note also that clear problems exist with the manner in which the TSSAA seeks to apply the "unconstitutional conditions" doctrine. The TSSAA relies on *Umbehr* to argue that the "unconstitutional conditions doctrine specifically allows a state agency to impose conditions, even on fundamental rights like free speech, when those conditions are reasonably necessary to accomplish the objectives of the contract." This is not an accurate reading of *Umbehr*, which held that the First Amendment limits the government's ability to terminate relationships with independent contractors because of their speech. *See* 518 U.S. at 673-74. Moreover, *Umbehr*, in which the Court addressed only the narrow issue of "whether, and to what extent, independent contractors [with the government] are protected by the First Amendment," *id*. at 673, is not a precisely apposite precedent anyway. *See also id*. at 685 (emphasizing the "limited nature of our decision today"). The present case does not involve the government as a party in a contractual relationship with an independent contractor, *cf. id*. at 678-79.

Similarly, there are obvious differences between the TSSAA's role in this case and the government's role as employer, *cf. Pickering*, 391 U.S. at 574. The TSSAA's reliance on the argument that Brentwood's speech is not a matter of public concern is thus misplaced. The requirement that speech relate to a matter of public concern in order to be protected emanates from the government employee cases in which employee speech is limited in many respects by virtue of the employer-employee relationship. *See id*. at 568 ("The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."). The public concern requirement is not a part of the intermediate scrutiny given to a content-neutral restriction on speech. The 2001 decision of this court, in discussing the waiver issue, described the way in which public interests were to be taken into account on remand. In that decision, this court observed that substantial government interests, which the TSSAA would have to establish, were of necessity matters of public concern. *Brentwood Acad.*, 262 F.3d at 551. In making this observation, it placed the public interests concept in its proper place in the framework adopted later in the opinion – on the governmental interest in promulgating the rule, not on the question of whether Brentwood's speech related to a matter of public concern. *See id*. at 557-58.

A couple of nuances in the TSSAA's argument deserve mention. The TSSAA urges the applicability of its preferred analysis by differentiating between the government's "sovereign power" and its "contractual power." In doing so, it makes much of the dicta in *Umbehr* discussing the difference between the government's "sovereign power" and its "contractual power." *See* 518 U.S. at 678. Reading *Umbehr* too broadly, it asserts that *Umbehr* extended the *Pickering* "public concern" framework to "any case where the government is exercising contractual power as opposed to sovereign power." Again, the applicability of the First Amendment to the TSSAA's regulatory conduct does not hinge on whether there was a contract or not. Even if such a distinction between contractual and sovereign power were applicable in any meaningful way to the present case, the Court's conclusion in *Umbehr* – that some scrutiny more deferential than strict scrutiny should apply

---

[5]It is interesting to note that the TSSAA, in its first appeal to this court, challenged the "analytical framework that the district court used" in its initial decision. *Brentwood Acad.*, 262 F.3d at 551. We agreed with the TSSAA the last time around, holding that "the district court erred in concluding that the recruiting rule is a content-based regulation that fails strict scrutiny review" and that, rather, the recruiting rule is content-neutral and subject to intermediate scrutiny. *Id*. at 551-53. In this appeal, however, we cannot agree with the TSSAA's challenge to the analytical framework governing the case and set out by this court previously.

when the government exercises contractual power – does not suggest that the First Amendment does not apply to the TSSAA's enforcement of its recruiting rule. *See id.* In fact, *Umbehr* suggests that the approach this court took in its previous opinion was the right one: that the First Amendment does apply to the rule, and intermediate scrutiny is the standard to which the rule should be subjected. *See Brentwood Acad.*, 262 F.3d at 551-54; *see also Umbehr*, 518 U.S. at 678 ("The tests that we have established in our government employment cases must be judicially administered with sensitivity to governmental needs, but First Amendment rights must not be neglected.").

A second nuance relates to the TSSAA's efforts to cast the present case as a "subsidy" case, where the government has considerable autonomy over how a government program is administered. This characterization is similarly futile. The defendants state in their brief that "TSSAA membership is a subsidy" and that under *Rust v. Sullivan*, 500 U.S. 173 (1991), the government acting as a contractor in a subsidy context "must be able to require the contracting party to limit its speech when reasonably necessary to effectuate the purposes of the contract." Tellingly, the defendants cite to no page in the *Rust* opinion that supports this reading of the case; there is none. *Rust* involved a government funding program involving disbursements to doctors to advise patients on family planning topics. One condition of the program was that no funds could be used in programs where abortion was presented as a method of family planning. The Court upheld the program, reasoning that Congress had "merely chosen to fund one activity to the exclusion of the other." *Id.* at 193. In later First Amendment jurisprudence, the Court "explained *Rust* on th[e] understanding" that the government in that case was itself engaging in speech and could thus make viewpoint-based funding decisions. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541 (2001); *see also United States v. Am. Library Ass'n*, 539 U.S. 194, 211-12 (2003) (plurality opinion) (citing *Rust* in upholding the government's requirement that libraries receiving federal subsidies utilize filtering software). Clearly, the TSSAA's enforcement of the recruiting rule is not a funding program. Nor does it represent government speech. Cases like *Rust* do not govern the present case.

Thus, as the 2001 panel determined, the appropriate characterization of the TSSAA's role is as a government regulator, a context to which the First Amendment surely applies. *See, e.g., Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 834-35 (1995); *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130-31 (1992); *see also Brentwood Acad.*, 531 U.S. at 291 (holding that the association's "*regulatory* activity" is state action, even though "[n]o school is forced to join" the TSSAA) (emphasis added); *id.* at 292-93 (noting that the Tennessee State Board of Education designated the TSSAA as "the organization to supervise and *regulate* [interscholastic] athletic activities" in Tennessee, and that the present case was triggered by a "*regulatory* enforcement proceeding") (emphasis added). The applicability of the First Amendment to regulation of speech by the government in this context does not vary depending on whether the speech relates to a matter of public concern or whether the relationship between the government and the speaker is voluntary or contractual. For example, when the government regulates how and when citizens can enter into voluntary contractual relationships with the government that regulate certain speech by those citizens, the government's licensing or regulatory scheme must meet constitutional standards, regardless of whether the speech at issue involves a matter of public concern. *See Forsyth County*, 505 U.S. at 129-31; *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 552-53 (1975). The same goes for the TSSAA's application of its recruiting rule.

We thus reject the defendants' attempt to reshape the framework through which we view this case - a framework set out by this court previously and utilized by the district court in trying the case. The TSSAA, in administering its rules and regulations and imposing penalties against member schools, acts as a regulator, not as an employer, contractor, or disburser of funds. Therefore, as this court has previously concluded, Brentwood's First Amendment rights are at issue in this case, and intermediate scrutiny applies to the TSSAA's application and enforcement of the recruiting rule.

The dissenting opinion accepts the TSSAA's invitation to revisit previously rejected arguments and to recharacterize them as new ones. In fact, it even goes beyond the TSSAA's arguments and suggests that no First Amendment rights are implicated here.

The opening sentences of the dissenting opinion are conceptually attractive when first read. They are: "High school football is a game. Games have rules." Of course, games have rules. And so do cases. Here, the rule is called "law of the case." The dissent correctly notes that this dispute hardly evokes our notions of the core values of the First Amendment; the same could doubtless be said of other examples of First Amendment jurisprudence. But, in this case, the time for appellate court observation of any lack of a First Amendment issue was long ago.

In recycling the TSSAA's waiver argument, the dissent characterizes the 2001 panel decision as dealing with a broad issue of whether Brentwood had waived its right to sue entirely. The problem with this interpretation is that in 2001 Brentwood *had* sued and *had* challenged the same rule at issue in this appeal. The panel was discussing waiver in this context, and the clear import of its decision is that Brentwood had not waived or given up its right to challenge the rule at issue here by entering into a contract with the TSSAA.

Another difficulty with the dissent's waiver theory is that it is implicitly based on the content of the contract. Yet the contract here contains no provision that assists in the analysis. Brentwood does agree to be bound by the rules. If the TSSAA were not a state actor, that would be the end of the story. Since the TSSAA *is* a state actor, the contract gives no guidance as to whether Brentwood waived a right to challenge a rule it considered unconstitutional. The contract's silence thus becomes evidence of an absence of waiver of constitutional rights. The silence provides no basis for differentiating between a waiver of some rights and not others.

## B. Application of the Recruiting Rule to Brentwood

Turning to the analysis of the First Amendment issue, we consider whether the TSSAA's application of the recruiting rule to Brentwood violates the First Amendment. In the 2001 opinion, the court laid out the intermediate scrutiny analysis that applies to content-neutral regulations:

> [A] regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but . . . it need not be the least restrictive or least intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation . . . . The validity of time, place, or manner regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted.

*Brentwood Acad.*, 262 F.3d at 557 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798-800 (1989) (internal quotations, citations, footnotes, and alterations omitted)). The TSSAA has asserted three interests as justification for the recruiting rule: (1) to keep high school athletics in their proper place subordinate to academics; (2) to protect student athletes from exploitation; and (3) to foster a level playing field among the various member schools. *See id.* In its previous opinion, this court recognized the first interest as legitimate and substantial. *See id.* at 557-58 (citing *Crocker v. Tenn. Secondary Sch. Athletic Ass'n*, 980 F.2d 382, 386-87 (6th Cir. 1992)). This court remanded to the district court to determine whether the TSSAA's other two asserted substantial state interests for the recruiting rule were legitimate. *Id.* at 558.

The district court held that the TSSAA has a substantial governmental interest in protecting student athletes from exploitation. While it also held that the TSSAA's interest in fostering a "level playing field" was a legitimate governmental interest, it found that this interest was not substantial, especially considering that "[t]he substantial governmental interest in informed school choice trumps any governmental interest in controlling which schools or teams win athletic contests." Unlike rational basis review, intermediate scrutiny does not allow a court to supplant the particular interests put forward by the state with other suppositions. *See Edenfield v. Fane*, 507 U.S. 761, 768 (1993). In determining whether an interest is substantial, a court must look beyond "hypothesized justifications," *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373-74 (2002), and focus instead on the "actual interests served by the restriction." *Edenfield*, 507 U.S. at 768.[6]

The district court's conclusions regarding the TSSAA's interests, which we review *de novo*, were not erroneous. With regard to the asserted interest of protecting student athletes against exploitation, the TSSAA presented voluminous evidence at trial, primarily via expert witness testimony, in support of its argument that this interest is a substantial one. Carter testified that the "fundamental" reason for the recruiting rule was preventing exploitation. One of Brentwood's expert witnesses even testified that preventing the exploitation of student athletes, defined as the "selfish, unjust utilization of students for a school's benefit rather than for the benefit of the individual student," was a compelling state interest. At one point in its brief, Brentwood seems to suggest that evidence such as written legislative history or testimony from the initial drafters of the recruiting rule is necessary to prove that preventing exploitation of students was one of TSSAA's "actual" interests in applying the rule to Brentwood.[7] For the purposes of the first prong of the intermediate scrutiny test, it is only necessary to establish that the actual interest exists and is substantial, and this can be done without resort to such primary sources. While there is no known written legislative history for the recruiting rule and all of the initial drafters of the rule are dead, the evidence, especially Carter's testimony under oath, suggests that preventing the exploitation of middle school student athletes is a substantial state interest and was one of the TSSAA's "actual" interests in applying the rule to Brentwood. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 312 (2000) (Souter, J., concurring in part and dissenting in part) (quoting *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 664 (1994) (plurality opinion)) (noting that the state can regulate speech to further an interest in preventing reasonably "anticipated harm," as long as the harm is real); *see also* Knight Foundation Commission on Intercollegiate Athletics, *A Call to Action: Reconnecting College Sports and Higher Education* 20-21 (2001) (noting that "[h]igh school sports today can reflect the worst of their collegiate counterparts" in terms of exploitative commercial influences, pervasive recruiting efforts, and academic compromises for student athletes focused only on a professional athletic career); *cf. Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 462 (1978) (holding that the state has an important interest in preventing solicitation by lawyers that involves undue influence, intimidation, overreaching, and other forms of "vexatious conduct").

The TSSAA also introduced evidence that supports its contention that fostering a level playing field among member schools is a legitimate state interest. Specifically, its experts and

---

[6]*Edenfield* and *Thompson* are commercial speech cases, but the test they apply, just like the test applicable here, asks the court to determine whether the asserted state interests are substantial. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 564 (1980).

[7]Mostly, however, Brentwood conflates the "substantial interest" prong of the intermediate scrutiny test with the "narrowly tailored" prong, conceding later in its brief that the "TSSAA has a substantial interest in preventing exploitation of students," defined as "a student...being threatened, coerced, or harassed." Brentwood's argument that there are "problems with this theory...as a justification for TSSAA's disciplinary action" against Brentwood is evaluated in the next section of this opinion, since this is an argument that the application of the rule was not "narrowly tailored" to further Brentwood's legitimate and substantial interests.

Brentwood's own Headmaster Brown testified that the recruiting prohibition helps level the playing field among schools, especially as between private schools with significant resources and public schools with more limited resources and access to potential students. Carter testified at length about *how* the recruiting rule preserves competitive equity among schools, explaining that without the rule, "the rich would get rich real quick, and the poor would get poor real quick." There is very little, if any, evidence, however, explaining *why* competitive equity is an important value in the first place. It may be true, as defendants claim in their brief, that "maintenance of fair competition among [the TSSAA's] members lies at the core of [the TSSAA's] reason for being," but simply saying this is so does nothing to demonstrate why such a "reason for being" is a substantial state interest. State actors may act out of a variety of interests, but only some are substantial. The defendants can cite to no evidence to support the notion that ensuring that high schools compete in interscholastic sports in an equitable manner is a substantial state interest, especially when coupled with the admittedly substantial interest of ensuring that athletics do not become more important than academics at the high school level. The district court was right that this interest, while legitimate, is not substantial.[8]

Having established that the TSSAA has substantial state interests in keeping athletics subordinate to academics and preventing the exploitation of student athletes, the next question in the analysis, as set out in this court's previous opinion on the matter, is whether the recruiting rule, "as applied to Brentwood," is narrowly tailored to further those interests. *See Brentwood Acad.*, 262 F.3d at 557; *see also Turner Broad. Sys.*, 512 U.S. at 664 (plurality opinion) ("That the Government's asserted interests are important in the abstract does not mean...that the [speech regulation] will in fact advance those interests."). Specifically, the district court's task was

> to decide if the punishment exacted for these alleged violations relating to the free game tickets, spring football-practice letters, and the followup telephone calls was appropriate regulatory action narrowly tailored to further TSSAA's legitimate interests as a state actor....In proceeding with this case on remand, we caution both the parties and the district court to stay focused on the two alleged recruiting rule violations in question, rather than engage in a wide-ranging attack or defense of the recruiting rule as a whole.[9]

*Brentwood Acad.*, 262 F.3d at 558. This court also noted in its previous opinion that the application of the recruiting rule must not "'unreasonably limit alternative avenues of communication.'" *Id.* at 554 (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47 (1986)). On remand, the

---

[8]Despite our conclusion that the district court correctly found that the TSSAA had established substantial state interests in keeping athletics subordinate to academics and preventing the exploitation of student athletes, the dissent devotes considerable attention to a discussion of the type of proof a defendant might have to present to support such interests. The two opinions do not differ on the ultimate point, that is, the TSSAA did have substantial state interests at stake. The true point of departure is whether the rule "as applied to Brentwood" is narrowly tailored to further those interests. *See Brentwood Academy*, 262 F.3d at 557.

[9]The "two alleged recruiting rule violations" referred to here are: (1) the free game tickets and (2) the spring practice letters and followup calls. *See Brentwood Acad.*, 262 F.3d at 548. While this court's previous opinion considered both of these rule violations as bases for Brentwood's First Amendment claim, neither the initial district court opinion nor the opinion being appealed here applied First Amendment scrutiny to the application of the recruiting rule to the free game tickets episode. In both opinions, the district court considered only whether the application of the rule to the letters and phone calls was constitutional. Defendants state in their brief that "[o]nly the spring practice letters and phone calls formed the basis of [Brentwood]'s First Amendment claim."

The disconnect between this court's previous opinion and the district court's opinions on this point is likely due to the fact that, judging from its brief, Brentwood has focused its First Amendment claim on the punishment for the letters and calls, recognizing, perhaps, that it is unclear whether the First Amendment is implicated by the provision of free game tickets. Regardless, we confine our "narrowly tailored" inquiry to the letters and calls, leaving the free tickets episode to be considered under substantive due process analysis.

district court held that the recruiting rule "is not narrowly tailored to further any of the three governmental interests of the TSSAA as applied to Brentwood Academy."[10]

Reviewing *de novo*, we affirm this conclusion. The defendants import a definition of "enrolled" from a separate provision in the TSSAA Bylaws to support their argument that the students contacted by the letters and calls were not truly enrolled at Brentwood and that Brentwood therefore violated the recruiting rule by contacting them. Putting aside the fact that the Bylaw provision upon which defendants rely seems to apply not to practices or recruiting but rather only to eligibility to participate in athletic contests, the defendants' contention that the students at issue were not enrolled misses the point. Considering that the interpretive commentary to the recruiting rule is not binding and serves only as a guideline, the TSSAA's use of its discretion to punish Brentwood for the letters and calls was not a narrowly tailored way to keep athletics subordinate to academics at Brentwood or ensure that the student athletes being contacted were not being exploited.[11]

First, surely, however one defines "exploitation," this interest was not furthered by punishing Brentwood. As the district court pointed out, the students contacted by the letter and calls had already signed enrollment contracts with Brentwood Academy, and the letter and calls were directed to all male students who had done so. In fact, Brentwood did not send the letter to one male student who had been accepted by Brentwood but had not yet signed an enrollment contract. Indeed, the students contacted had all agreed, and by all accounts were excited, to attend Brentwood the following year. Additionally, it is clear that the followup phone calls were made to clarify for the students involved that the practice was optional and should not preclude any other commitments they might have. The district court was right that "[n]either students nor parents were exploited in theory or in fact."

With regard to the former interest (keeping athletics subordinate to academics), it is a closer call, but the TSSAA's use of the regulation to punish Brentwood seems to "burden substantially more speech than is necessary to further the government's legitimate interest[]" in keeping athletics subordinate to academics. *See Ward*, 491 U.S. at 799; *see also United States v. O'Brien*, 391 U.S. 367, 377 (1968) (holding that content-neutral regulations will be sustained only "if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest"). The TSSAA must demonstrate that in this situation "the recited harms [were] real, not merely conjectural, and that the regulation [would have] in fact alleviate[d] these harms in a direct and material way." *Turner Broad. Sys.*, 512 U.S. at 664. They did not demonstrate this at trial. The district court obviously found the testimony of the parents of the boys in question to be more significant and persuasive than evidence from experts indicating that the letters and calls might – in theory – signal an emphasis on athletics over academics. The parents indicated they were glad to get the letter, and they did not at all think the implication of the letter was that Brentwood subordinated athletics to academics.

If the letters and calls were the first or only pieces of information the students or their families had ever received about Brentwood or would receive before arriving at the school, then an argument could be made that the school was unduly emphasizing athletics over academics. This was

---

[10]Even though the district court found that fostering a level playing field was not a substantial state interest, it nonetheless included the interest in its "narrowly tailored" analysis.

[11]It is worth noting again that the district court's task was to consider the application of the recruiting rule specifically to Brentwood on these facts. The district court's opinion does not mean that application of the recruiting rule to other schools communicating in similar ways to students would be unconstitutional. For example, it is possible that letters and calls similar to the ones at issue here would be exploitative in a different context.

not the case. Each of the families of the children in question had already signed enrollment contracts with Brentwood. The information about spring football practice was simply information being provided to incoming students about an extracurricular activity available to them – an activity in which incoming students were allowed to participate under TSSAA rules.[12] Incoming students at Brentwood received a variety of information about a multitude of topics and activities, including academics at the school, and the letters and calls should be seen in this context.[13]

Even if the students could (and sometimes did) "wiggle out" of their contracts with Brentwood, this did not mean that Brentwood should be punished for disseminating information about an optional activity for incoming Brentwood students. In fact, defendants' argument that the students in question were not technically enrolled and could have still decided to attend another school might even weigh in Brentwood's favor, in that the letters and calls could be seen as part of an ongoing attempt to make sure the incoming students were informed about what Brentwood had to offer. That these particular communications emphasized athletics does not mean that punishing Brentwood for the communications served the TSSAA's interest in keeping athletics subordinate to academics. In this context, the harm the TSSAA sought to prevent was "conjectural," not "real," or at least not based on the evidence in the record. *See id.* Put another way, it is not clear that the TSSAA's substantial interest in subordinating athletics to academics was achieved any more effectively by punishing Brentwood for Flatt's letters and calls than it would have been had no punishment been handed down. *Cf. Ward*, 491 U.S. at 798-801, 800 n.7 (holding that a sound-amplification guideline that eliminated the evils the city sought to eradicate without restricting a substantial quantity of speech represented "the essence of narrow tailoring," because it was not "substantially broader than necessary to achieve the interests justifying it"); *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 810 (1984) (upholding a time/place/manner regulation because it "respond[ed] precisely to the substantive problem which legitimately concerns the City").

---

[12]That the rule was subsequently changed to prevent such participation in spring practice bolsters the conclusion that the TSSAA's punishment of Brentwood in this case was not narrowly tailored. Banning spring practice participation, rather than applying the recruiting rule punitively to Brentwood's invitation to participate in the approved activity, would have been a more narrowly tailored way to promote the TSSAA's substantial interests. *See Thompson*, 535 U.S. at 373 ("[R]egulating speech must be a last – not first – resort. Yet here it seems to have been the first strategy the Government thought to try.").

[13]Headmaster Brown testified:

> [A]s far as enrollment, we had to deal with our kids to get them acclimated to the school before they came. It would be – there's no way that they could start with no contact from the school before. I mean that's part of what all schools do. I mean they have got to get reading lists, got to know about the picnics, got to know about the options in the summer retreat, work options, and all of that so we have to communicate with them.

Admissions Director Brasher noted that admission is generally granted in November or February of the previous school year, and after a student is admitted and signs the enrollment contract, the student receives a packet of information, including a letter from the admission director, the student-parent agreement, and the handbook for Brentwood Academy with policies and procedures. Also, once an enrollment contract is signed, that student's family is put on the school's general mailing list, and they receive all the information that is sent to current students. Brasher provided more details:

> We have a mailing that goes out usually about the end of May that will include reading list, letters from the English teachers, information about our summer session which includes summer school, computer camps, drama camps, athletic camp, driver's ed. We have arts in April, it's a big fine arts venue in April and we send them information on that.

Brasher also noted that there are some mailings that are targeted to particular groups of students, such as a letter about cheerleading tryouts that is sent only to girls.

To justify its regulation on Brentwood's speech, the TSSAA cannot rely on "shoddy data or reasoning"; rather, its evidence must "fairly support [its] rationale" for the application of the recruiting rule to the letters and calls. *See City of L.A. v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002). Carter himself seemed to doubt that one could actually measure whether such letters and calls would emphasize athletics over academics or exploit the children:

> Well, I think, first of all, you can't measure – you can't measure it on the effect that it had on those kids or any other circumstance that would occur. If [exploitation] occurs, then it's very difficult to imagine what impact it has on or to figure out what impact – I very seldom have seen kids in those situations that think it's had any impact on them. But it's very hard to turn around and determine that.

Carter's instinct was accurate, since despite evidence by numerous parents, school officials, and experts at trial, there was no evidence to show that the punishment of Brentwood was justified due to the effect of Brentwood's actions on the children or the relative standing of academics and athletics at the school. In sum, the TSSAA did not show that the application of the recruiting rule to Brentwood was narrowly tailored to serve the TSSAA's substantial interests.[14] Reviewing *de novo*, we affirm the holding by the district court on this issue.[15]

---

[14]This court's previous opinion supports this conclusion. In determining that the recruiting rule is content-neutral, rather than content-based, this court pointed out that the recruiting rule does not impose a "total ban...on communications between secondary schools and middle school athletes regarding high school athletics." *Brentwood Acad.*, 262 F.3d at 551-52. According to the court's opinion, the greatest restriction imposed by the rule is the "prohibition on coaches...from initiating contact with middle school students *for the purpose of recruiting student athletes*." *Id*. at 552 (emphasis added). The rule allows "numerous ways in which Brentwood can get its message about athletics out to prospective students," as evidenced by the letter written by Brentwood's lawyer to the TSSAA in 1993 detailing Brentwood's understanding of various acceptable modes of communication. *Id.* On remand, the district court determined that applying the rule to the letters and calls was unconstitutional, since the application of the rule to the letters and calls was not narrowly tailored to further the TSSAA's substantial interests. Under the terms of this court's previous opinion, one could also read the district court opinion as a suggestion that the communications either were not made for the purpose of recruiting student athletes, or fell under the category of acceptable modes of communication under the recruiting rule, or both.

[15]The dissenting opinion's approach to this aspect of the case departs from a record-based analysis of whether the application of the recruiting rule to Brentwood was narrowly tailored to serve the TSSAA's substantial interests. In doing so, it neglects consideration of the evidentiary record, a process that an as-applied challenge necessarily entails, and substitutes theoretical analogies between recruiting rules and restrictions on adult-oriented businesses. While the dissent's approach might be appropriate in cases involving facial challenges to a regulation, such as *Renton* and *Ward*, on which the dissent heavily relies, it is inconsistent with the proper analysis for an as-applied challenge. *See Taxpayers for Vincent*, 466 U.S. at 796, 803 (distinguishing between a facial challenge and an as-applied challenge and concluding, after determining that the appellee could not establish that the law is "unconstitutional in every conceivable application, or...seeks to prohibit such a broad range of protected conduct that it is unconstitutionally 'overbroad,'" that the challenge was "basically a challenge to the ordinance as applied to [the appellee's] activities," and therefore "limit[ed] [the Court's] analysis of the constitutionality of the ordinance to the concrete case before [it]"); *cf. Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) (noting that litigants bring a facial challenge where they attack "a statute not because their own rights of free expression are violated, but because...the statute's very existence may cause others not before the court to refrain from constitutionally protected speech").

The dissenting opinion's only arguable reference to the trial court record on the issue of whether application of the rule to Brentwood was narrowly tailored to serve the TSSAA's substantial interests is its suggestion that the rule permitted Brentwood to distribute its letters to private athletic leagues and other schools and permitted Brentwood coaching staff to refer potential students who contacted them to other Brentwood officials. The dissent deems these options alternative channels for communication. While these options are presumably permissible (but not mentioned in the evidence), they are hardly viable alternatives for achieving Brentwood's purpose and communicating the information contained in the letters to incoming students. The dissent's noting of these options is another way of saying that the recruiting rule did not prohibit Brentwood from advertising its sports and other offerings to the world at large through any available public medium, but that fact has little if anything to do with whether the recruiting rule as applied to Brentwood was narrowly tailored to serve the TSSAA's substantial interests.

### C. Free Tickets as a Substantive Due Process Violation

The district court also held that the application of the recruiting rule to Brentwood violated the school's substantive due process rights with regard to the free tickets used by two students to attend a Brentwood football game. After citing authority indicating that the doctrine of substantive due process means that "governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed," *see Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992) (internal quotation marks and citation omitted), the district court centered its substantive due process analysis on the notion that

> [a]s applied, the Recruiting Rule did not give Brentwood Academy constitutionally adequate notice that providing tickets to another coach, who secretly disregards express instructions to use the tickets only for adults, will constitute a violation. The Recruiting Rule is unconstitutionally vague as applied to Brentwood Academy on the facts of this case.

The court went on to explain that "the Recruiting Rule did not give...Brentwood Academy[] a reasonable opportunity to know what was prohibited with regard to complimentary tickets so that it could act accordingly."

When the vagueness argument was formulated as a First Amendment challenge, this court repudiated it. *See Brentwood Acad.*, 262 F.3d at 557 ("As a whole, the [recruiting] rule gives reasonable notice of what is prohibited, especially as applied to Brentwood."). Essentially, the district court has now recast its previous holding striking down the recruiting rule as overbroad and vague (a holding that was reversed) as a determination that Brentwood's substantive due process rights were violated. *See Brentwood Acad.*, 13 F. Supp. 2d at 693. Yet, if the substantive due process claim is characterized as a vagueness challenge,[16] then for the reasons set out in this court's previous opinion, the claim fails. *See Brentwood Acad.*, 262 F.3d at 555-57; *see also Grayned v. City of Rockford*, 408 U.S. 104, 112 (1972) (upholding an anti-noise ordinance against a vagueness challenge because it clearly "delineates its reach in words of common understanding") (internal quotation marks and citation omitted). If the substantive due process claim instead rests on an argument that the TSSAA's application of the recruiting rule infringed some fundamental constitutional right, the claim fails because no such right is implicated here,[17] and the TSSAA's action was thus subject only to rational basis scrutiny. *See Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 488 (1955). Lastly, if the substantive due process claim rests, as the district court seems to intimate at one point, on an allegation that the TSSAA acted arbitrarily or capriciously to deprive Brentwood of a property or liberty interest, it still fails, at least as a *substantive* due process claim. Brentwood could not reasonably allege that the defendants perpetrated an "egregious abuse of governmental power" sufficient to give rise to a substantive due process claim, because there is no evidence to suggest that the defendants "maliciously and intentionally abused [their] state authority in order to injure" Brentwood. *See Vinson v. Campbell County Fiscal Court*, 820 F.2d 194, 201 (6th Cir. 1987). Indeed, such a claim of a deprivation of a property or liberty interest, at

---

[16]Brentwood's initial complaint lumps together a number of justifications for its claim that TSSAA violated its substantive due process rights. For instance, Brentwood claims that the recruiting rule infringed on liberty interests of students and parents to choose their schools, the recruiting rule is too vague, and the rule is fundamentally unfair in that Brentwood was punished for actions of a person beyond its control. The third argument is better analyzed as a procedural due process claim and is considered *infra*. *Cf. County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (holding that substantive due process precludes certain government actions "regardless of the fairness of the procedures used to implement them") (citation omitted).

[17]The fundamental right to educate one's own children, *see Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-35 (1925), is not at issue, especially since the regulation and penalties were applied only against Brentwood, not against the parents of the children involved.

least outside of the zoning context, *see Pearson*, 961 F.2d at 1217, is more appropriately characterized as a procedural due process claim, which is considered *infra*. For all of these reasons, the district court erred in concluding that the application of the recruiting rule to penalize Brentwood for the free game tickets episode violated Brentwood's substantive due process rights. We reverse the district court on this issue.

## D. Procedural Due Process Claim

The district court also found that Brentwood's procedural due process rights were violated. The Fourteenth Amendment provides, in part, that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Procedural due process generally requires that the state provide a person with notice and an opportunity to be heard before depriving that person of a property or liberty interest. *See, e.g.*, *Thompson v. Ashe*, 250 F.3d 399, 407 (6th Cir. 2001) ("Courts have long recognized that the Fourteenth Amendment requires that an individual who is deprived of an interest in liberty or property be given notice and a hearing."). Only after a plaintiff has met the burden of demonstrating that he possessed a protected property or liberty interest and was deprived of that interest will the court consider whether the process provided the plaintiff in conjunction with the deprivation, or lack thereof, violated his rights to due process. *Hamilton v. Myers*, 281 F.3d 520, 529 (6th Cir. 2002).

The first issue is whether Brentwood was deprived of a property interest. Clearly, at a minimum, fining Brentwood $3,000 deprived Brentwood of a property interest. *See Herrada v. City of Detroit*, 275 F.3d 553, 556 (6th Cir. 2001). The panel need not decide whether potential lost revenues due to the ban from playoff participation also qualify as a property interest.

The second step in the procedural due process analysis is determining whether the TSSAA's deprivation of Brentwood's property interest contravened notions of due process. Under circuit precedent, a § 1983 plaintiff can prevail on a procedural due process claim by demonstrating that the property deprivation resulted from either: (1) an "established state procedure that itself violates due process rights," or (2) a "random and unauthorized act" causing a loss for which available state remedies would not adequately compensate the plaintiff. *Macene v. MJW, Inc.*, 951 F.2d 700, 706 (6th Cir. 1991). A plaintiff alleging the first element of this test would not need to demonstrate the inadequacy of state remedies. *Moore v. Bd. of Educ. of Johnson City Sch.*, 134 F.3d 781, 785 (6th Cir. 1998). If the plaintiff pursues the second line of argument, he must navigate the rule of *Parratt v. Taylor*, 451 U.S. 527, 539 (1981), which holds that a state may satisfy procedural due process with only an adequate postdeprivation procedure when the state action was "random and unauthorized." *See Macene*, 951 F.2d at 706. In *Zinermon v. Burch*, 494 U.S. 113, 128-29 (1990), the Supreme Court narrowed the *Parratt* rule to apply only to those situations where predeprivation process would have been impossible or impractical. In this context, an "unauthorized" state action means that the official in question did not have the power or authority to effect the deprivation, not that the act was contrary to law. *See id.* at 138.

Whether seen as an attack on an established state procedure or as an attack on a "random and unauthorized" act, Brentwood's claim is not subject to the *Parratt* rule, as it clearly was not "impossible" for the TSSAA to grant a predeprivation hearing[18] to Brentwood on these facts. *See*

---

[18]The district court stated that Brentwood was deprived of its property interests immediately upon issuance of the July 29, 1997, letter, simply because the letter itself said the penalties were effective immediately. *See Brentwood Acad.*, 304 F. Supp. 2d at 1005. The hearings held after this date, the court reasoned, were therefore postdeprivation hearings, which under certain Supreme Court precedent, must be more extensive and thorough than predeprivation hearings. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545 (1985). This conclusion by the district court seems wrong, as Brentwood did not pay the $3,000 fine, and it appealed the July 29, 1997, decision precisely so it would not have to pay the fine or be subject to any other penalty. Brentwood had thus not been "deprived" of its property by

*id.* at 128.  It seems clear that Carter and the Board had the authority to impose the penalties against Brentwood; their acts were not "random and unauthorized."  If, as is more likely, the TSSAA's action was the result of an "established state procedure," then the question becomes whether that procedure violated Brentwood's due process rights.[19]

Brentwood first argues that it was deprived of the right to a "neutral, impartial decisionmaker."  Brentwood points out that Carter acted as investigator, trial judge, initial appellate judge, and participant in the final appeal.  This court, however, has rejected arguments that due process is violated when the same official plays multiple roles in the process, such as when he acts as investigator, witness, presiding officer at hearing, and final decisionmaker.  *See Moore*, 134 F.3d at 786; *Duchesne v. Williams*, 849 F.2d 1004, 1005 (6th Cir. 1988) (en banc); *Newsome v. Batavia Local Sch. Dist.*, 842 F.2d 920, 926-27 (6th Cir. 1988).  This line of argument thus fails.

In finding a violation of Brentwood's procedural due process rights, the district court focused on Brentwood's alternative procedural due process argument: that during the TSSAA Board of Control's private deliberations after the August 23, 1997, hearing, the Board heard *ex parte* evidence regarding contacts with middle school students allegedly made on behalf of Brentwood, and that this evidence affected the Board's final decision and penalty.  Brentwood claims that it should have had the chance to rebut this evidence by cross-examining the TSSAA investigators who discussed these contacts with the Board during the private deliberations.  *See Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) ("In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses."); *see also Loudermill*, 470 U.S. at 546 ("The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement.").

In evaluating Brentwood's argument, it is necessary to recount in some detail the evidence about the subject of the *ex parte* discussion.  There had been reports made to the TSSAA alleging that an Amateur Athletic Union (AAU) basketball coach named Bart King urged particular middle school student athletes to attend Brentwood, had provided transportation to Brentwood for those students, and promised scholarships to those students.  Brentwood alleged in its initial complaint that King was in no way affiliated with the school and that Brentwood never represented to King or others that King had authority to act on its behalf.  After the TSSAA received reports containing the allegations involving King, two TSSAA officials, Gene Meness and Bernard Childress, investigated the matter.  Meness and Childress met with Brentwood Headmaster Brown in early June 1997 and asked Brown about King.  Brown suggested that they put questions regarding King and other issues in writing and send them to him.  Through an exchange of letters during July 1997, the TSSAA informed Brentwood that it was investigating the allegations relating to King, and Brentwood stressed to the TSSAA that King was in no way associated with Brentwood Academy. Meness and Childress did not speak to King during the investigation.

---

August 23, when the final hearing was held.  *Cf. id.* at 545-46 (drawing the deprivation line at the moment of termination of employment).  In any event, it is immaterial to the analysis in this case whether the hearing process occurred predeprivation or postdeprivation.

[19] Even if the acts were "random and unauthorized," and the *Parratt* rule did apply, the ultimate issue would be this same question: whether the procedure provided (the hearings in front of the Board of Control) was adequate.  *See Macene*, 951 F.2d at 706.

As the district court found, there was no indication from the TSSAA before the final hearing that it was still considering the Bart King allegation.[20] In fact, the district court determined that "the TSSAA and Carter misled Brentwood Academy about a person and allegation which ultimately mattered to the decision." *See Brentwood Acad.*, 304 F. Supp. 2d at 1004 n.29. Despite this lack of indication that King's conduct was at issue, at the final hearing on August 23, Brentwood's counsel Tom Nebel offered to call King as a witness, saying, "We have Bart King here to answer any questions. And it was our intention to put him on, but I don't know if you all are interested in extending for five minutes to hear Bart King or not. He's here if you want him." Carter answered, "No." Evidently this was the only discussion of King at the hearing. Carter later testified that "if Brentwood Academy wanted [to call King], they could have easily done it....The school can put on anything they want to." Nebel later testified that he was not cut off from presenting any information he wanted to present at the hearing.

Meness and Childress were present during the Board of Control's private deliberations following the August 23 hearing. While Childress recalled answering some questions posed by Board members, neither Meness nor Carter recalled answering any questions about Bart King. Board of Control President Mike Reed and Board member Michael Hammond testified that during the Board's private session, the Board discussed the allegations surrounding King's actions. In Reed's initial deposition in this case, Reed was asked whether the King allegations were one of the reasons behind the Board's ultimate finding (upon which the penalties were based, in part) that there was "[c]ontact with student-athletes, initiated by Brentwood Academy, while those students were enrolled at other schools." Reed answered affirmatively. However, at trial, Reed first testified that although the King allegations were a "factor" in the discussion of the final penalty, the "final penalty did not involve Bart King": "[W]e discussed Bart King and the situation that took place, we did, we discussed it, but the final penalty really dealt with the letter from Mr. Flatt." When asked about his deposition testimony at trial, Reed also referred to a lack of memory in his deposition testimony and further indicated that the situation with King "was a factor in the overall penalty." The assertion that the final penalty was not based on the King allegations was reiterated by Carter and Hammond in their testimony at trial.

The district court found that the TSSAA and Carter violated Brentwood's procedural due process rights by considering *ex parte* evidence during their private deliberations on August 23, 1997. In reaching this conclusion, the district court recounted the testimony of Board of Control President Reed as well as Board members Hammond, Mickey Dunn, and Morris Rogers, all of whom indicated in their testimony that TSSAA investigators Childress and Menees provided some information to the Board regarding their findings during the private session. Additionally, the court noted that Carter testified that Carter, Meness, and Childress were all present to answer questions from the Board during the private session. The court below also pointed out that "Bart King, according to Reed, was discussed and...was a factor in the penalties imposed." *Id.* at 1004. The court credited all of this evidence "based on the demeanor of the witnesses, the consistency of the testimony, and because the testimony is adverse to the witnesses' interests as TSSAA Board of Control members." *Id.*

---

[20] Carter's July 29, 1997, letter to Brown details six "concerns" and violations on which the penalties are based. Only the sixth concern, which obliquely refers to contacts "by persons not connected with Brentwood Academy," arguably has anything to do with King. The violation listed under concern six, however, gives no indication that the TSSAA seeks to assign any responsibility to Brentwood for any actions by King. At the first hearing on August 13, 1997, Brentwood submitted an affidavit from King denying the allegations detailed in the earlier exchange of correspondence between the TSSAA and Brentwood. Then, after the first hearing, Carter sent Brown a letter dated August 14, 1997, listing the violations found at the first hearing. None of these violations implicates King in any way.

The district court's factual finding that there was discussion during the Board of Control's deliberations about the King allegations was not clearly erroneous and, in fact, was well-supported by the evidence. The district court was also correct in its conclusion that Brentwood Academy did not have notice that the King matter was a possible basis for final TSSAA action against Brentwood. Whether the King issue was actually a factor in the penalties ultimately imposed is far less certain. Yet the district court was entitled to credit Reed's deposition and trial testimony that the King issue influenced the Board's findings and penalties over his contrary trial testimony and other evidence that the King issue was not a basis for the penalties.[21]     *See* Fed. R. Civ. P. 52(a) ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."). Thus, the finding that the King issue influenced the penalties is also not clearly erroneous.

There is no applicable precedent that describes the precise process a school such as Brentwood should receive from a state athletic association such as the TSSAA before the association imposes penalties such as the ones assessed here. *Cf. Loudermill*, 470 U.S. at 545-46 (setting out the due process requirements for termination of tenured public employees); *Goss v. Lopez*, 419 U.S. 565, 581 (1975) (setting out the due process requirements for short-term school suspensions); *Morrissey v. Brewer*, 408 U.S. 471, 488-89 (1972) (setting out the due process requirements for parole revocations). The district court therefore correctly looked to the general balancing test of *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976) to determine what process is due in this situation. The *Mathews* balancing test states:

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335.

The district court correctly concluded that in a situation such as the one presented by this case, due process requires that a school be informed of all of the issues relied on by an athletic association levying penalties against the school and be given a chance to respond to those issues before the penalties are imposed.[22] Such a requirement imposes only a minimal burden on the state actor and would be of great value in ensuring that a school is not wrongfully penalized. Moreover, as the district court noted, such a requirement is clearly consistent with the notification requirements set out by this court and others in analogous situations. *See, e.g., Loudermill*, 470 U.S. at 546 ("The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."); *Moore*, 134 F.3d at 786 ("[T]he process offered Moore was constitutionally sufficient. She received written notice of the charges against her, as well as an explanation of the Board [of Education]'s evidence, and was offered an opportunity to present her side of the story."); *Swank v. Smart*, 898

---

[21]Reed's deposition testimony is a prior inconsistent statement given under oath and also amounts to an admission against interest on the part of the TSSAA. Fed. R. Evid. 801(d)(1) & (2).

[22]The TSSAA complains that the district court "once again" ignored the contractual relationship between it and Brentwood in evaluating the procedural due process claim, but fails to articulate exactly how the contractual relationship lessens the TSSAA's obligation as a state actor to provide procedural due process.

F.2d 1247, 1253 (7th Cir. 1990) ("[The police officer] was entitled to challenge the chief's assessment of the damage caused by the [incident in which the officer was seen giving a girl a ride on his motorcycle]. Ex parte presentation of evidence denies due process...."); *id.* at 1256 ("[A] tenured public employee has a constitutional entitlement to a fair hearing before being fired and that with immaterial exceptions a fair hearing includes the right to be shown the evidence on which the tribunal has relied, including evidence pertaining to the gravity of the sanction to be imposed when liability is conceded.") (citations omitted); *Newsome*, 842 F.2d at 927 (holding that student was "denied procedural due process when the superintendent disclosed to the school board, during their closed deliberations, new evidence which had not been presented during the open hearing at which Newsome and his attorney were present"); *see also Greene v. McElroy*, 360 U.S. 474, 496 (1959) ("[W]here governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue.").

In sum, we affirm the district court's conclusion that the TSSAA and Carter violated Brentwood's procedural due process rights. The district court correctly determined what process was due to Brentwood: notice of the evidence relied upon in penalizing Brentwood and an opportunity to respond to that evidence before penalties were imposed. Here, the TSSAA failed to give that notice as it related to King. Brentwood therefore had no notice that it should respond to the King evidence at the hearings. Yet, the King evidence was used by the TSSAA in its deliberations and, under the district court's findings, influenced the penalties imposed on Brentwood. The failure to afford the requisite process violated Brentwood's Fourteenth Amendment rights to procedural due process.

### E.  Availability of Qualified Immunity for Carter

The district court also held that Carter was not entitled to qualified immunity. Whether a defendant is entitled to qualified immunity is a question of law reviewed *de novo*. *Thacker v. City of Columbus*, 328 F.3d 244, 259 (6th Cir. 2003). Qualified immunity protects government officials from civil liability for actions taken within their official discretion insofar as these actions do not violate clearly established statutory or constitutional rights of which a reasonable official would have been aware. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is not merely a defense to liability; rather, when applicable, qualified immunity protects government officials from lawsuits and, hence, the burdens of litigation. *See Saucier v. Katz*, 533 U.S. 194, 200-01 (2001).

The initial question here is whether the qualified immunity defense is even available to Carter, an employee of a non-profit corporation that has been found to be a state actor when engaging in regulatory activity. "In assessing whether the qualified immunity afforded state officials extends to private actors who are considered state actors under § 1983, [the court] must consider both the purposes of qualified immunity protection and the nature of the relationship between the state and the putative private party." *Bartell v. Lohiser*, 215 F.3d 550, 556 (6th Cir. 2000). This court held in *Bartell* that workers for a non-profit foster-care corporation that had contracted with the government and was closely supervised by a state agency were entitled to qualified immunity. *Id.* at 557. The *Bartell* court distinguished *Richardson v. McKnight*, 521 U.S. 399, 412 (1997), in which the Supreme Court held that private prison guards were not entitled to qualified immunity, as involving a for-profit corporation that operated with limited direct supervision by the government. *See Bartell*, 215 F.3d at 556-57 (citing *Richardson*, 521 U.S. at 413). Here, one of these factors weighs in favor of Carter (because the TSSAA is a non-profit corporation) and one weighs in favor of Brentwood (because the TSSAA operates with limited direct governmental supervision).

Nevertheless, a closer examination of *Bartell* and *Richardson* indicates that the balance is tipped towards Carter's argument that qualified immunity is available to him. Specifically, one of the key reasons qualified immunity was unavailable in *Richardson* was because the purposes

qualified immunity were already served by "marketplace pressures" that themselves "provide[d] the private firm with strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or 'nonarduous' employee job performance." 521 U.S. at 410. Here, there are no such marketplace pressures; the TSSAA, unlike the prison firm in *Richardson*, does not have to compete with other firms for the job it does on behalf of the state. Also, the *Richardson* court relied heavily on the fact that "[h]istory does *not* reveal a 'firmly rooted' tradition of immunity applicable to privately employed prison guards." *Id*. at 404 (citing *Wyatt v. Cole*, 504 U.S. 158, 164 (1992)). The district court in this case picked up on this rationale, noting that "[j]udicial history does not reveal a firmly rooted tradition of immunity applicable to employees of private athletic associations." The notion that there would be such a "firmly rooted" history, though, is unreasonable in the first place, considering that athletic associations like the TSSAA have only recently grown in importance and stature, and litigation involving such associations has been relatively rare. *See Brentwood Acad.*, 531 U.S. at 304 ("No one...has pointed to any explosion of § 1983 cases against interscholastic athletic associations...."); *see also Richardson*, 521 U.S. at 414-15 (Scalia, J., dissenting) (chiding the *Richardson* majority for relying on the historical absence of any cases in which immunity was successfully asserted by a private prison guard). We find that qualified immunity is available to officials such as Carter.

Having found that qualified immunity is available to Carter, the next question is whether it applies in this case. If an official acts within his discretionary authority and asserts qualified immunity, the burden shifts to the plaintiff to prove that the officer violated a right so clearly established that any reasonable official in his position would have understood it was unlawful to engage in the conduct that violated the right. *See Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000). This court evaluates this burden according to a three-prong standard. *See Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999). First, the court considers whether a constitutional or statutory violation occurred. *Id*. If so, the court then considers whether the right that was violated was clearly established in the sense that a reasonable person would have known of the right. *Id*. The right must have been "clearly established at the time of the actions in question." *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996). If the right was clearly established, the court's third step is to "determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Williams*, 186 F.3d at 691.

Having found that a violation of Brentwood's procedural due process rights occurred, the next question is whether Brentwood's rights were clearly established such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. On this point, there is simply no support for the district court's conclusion that "the contours of procedural due process were sufficiently clear and apparent that Carter had fair warning, and reasonably should have understood, that what he did violated the procedural due process rights of Brentwood Academy." As described above, there is no applicable authority describing what process state secondary athletic associations must provide when enforcing their regulations. It asks too much of Carter to expect him to have applied the *Mathews* factors and concluded that failing to give notice that the King issue would be considered and then considering it during the Board's private deliberations would violate Brentwood's due process rights. Regardless of Carter's extensive involvement in the investigation and decision making with regard to the TSSAA's penalties against Brentwood, there is no evidence that his conduct was objectively unreasonable, or that Brentwood's due process rights (or First Amendment rights, for that matter) in this context were clearly established. For these reasons, we reverse the district court on this issue and find that Carter is entitled to qualified immunity.

## F. Antitrust Immunity

The district court ruled in an October 2002 order that the TSSAA was entitled to antitrust immunity under the doctrine of *Parker v. Brown*, 317 U.S. 341 (1943). Brentwood appeals from this order, arguing that the doctrine does not apply and that its antitrust claim should be permitted to proceed.[23]

In addition to the facts noted earlier about the TSSAA as an organization, the following facts are pertinent to the antitrust immunity inquiry. The bulk of the TSSAA's revenues come from gate receipts at member teams' tournaments, but member schools do pay annual dues. TSSAA employees are not paid by the state but are eligible to join the state employee retirement system. The voting membership of the Board of Control and Legislative Council (the rulemaking body of the TSSAA) are composed of school administrators, and the public school administrators who typically serve in these positions carry out their TSSAA duties during regular school hours.

The district court issued only a cursory explanation of its decision on this issue. The court explained, without analysis, that the Supreme Court's decision on "pervasive entwinement" meant that the TSSAA was a state actor "for purposes of antitrust immunity." However, while there are similarities between the two tests, the *Parker* antitrust immunity inquiry is different from the inquiry into whether state action exists for the purposes of § 1983 and the Fourteenth Amendment. *See Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 194 n.14 (1988) (noting that the two inquiries are "somewhat similar" but "by no means identical"); *Tarabishi v. McAlester Reg'l Hosp.*, 951 F.2d 1558, 1565 n.6 (10th Cir. 1991). Indeed, the extensive case law on the issue of *Parker* antitrust immunity reveals that the doctrine does not apply to the TSSAA.

In *Parker*, the Supreme Court held that when a "state in adopting and enforcing [a regulatory] program..., as sovereign, imposed the restraint as an act of government," the program could not violate the Sherman Act, because the Act was directed against "individual and not state action." 317 U.S. at 352; *see also City of N. Olmstead v. Greater Cleveland Reg'l Transit Auth.*, 722 F.2d 1284, 1287 (6th Cir. 1983) ("[The] doctrine enunciated in *Parker*...exempt[s] 'anticompetitive conduct engaged in as an act of government by the state as sovereign, or, by its subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service' from Sherman Act control.") (quoting *City of Lafayette v. La. Power & Light Co.*, 435 U.S. 389, 413 (1978) (opinion of Brennan, J.)) (emphasis removed). The Court has clarified that while *Parker* immunity clearly applies to a state legislature or a state supreme court acting in its legislative capacity, when the regulatory activity is carried out by others pursuant to state authorization, the program must meet the two-part standard set out in *California Retail Liquor Dealers Ass'n v. Midcal Aluminum*, 445 U.S. 97 (1980). *See Hoover v. Ronwin*, 466 U.S. 558, 567-68 (1984). "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself." *Midcal Aluminum*, 445 U.S. at 105 (quoting *City of Lafayette*, 435 U.S. at 410 (opinion of Brennan, J.)).[24] Like other judicially imposed exemptions from the antitrust laws, the *Parker* doctrine must be narrowly construed. *See FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 636 (1992).

---

[23]In its brief the TSSAA argues a number of issues relating to the antitrust claim. Before the district court, however, it raised only the antitrust immunity issue, and we will therefore not consider the other issues on appeal. *See Barner v. Pilkington N. Am., Inc.*, 399 F.3d 745, 749 (6th Cir. 2005).

[24]In *Midcal Aluminum*, the Court held that a California price-setting system for wine met the first but not the second prong of the test, because the state simply authorized the price setting and enforced the prices established by private parties. 445 U.S. at 105. The State did not monitor market conditions or otherwise actively supervise the program. *Id.* at 105-06. Therefore, California's involvement was not sufficient to establish *Parker* immunity. *Id.*

The first question under the *Midcal Aluminum* test is whether the TSSAA acts pursuant to a "clearly articulated and affirmatively expressed" state policy to displace competition. 445 U.S. at 105. This policy must be one clearly articulated in the first instance not by a state agency, *see Goldfarb v. Va. State Bar*, 421 U.S. 773, 790 (1975), but by "the State itself, such as a policy approved by a state legislature...or a State Supreme Court," *see S. Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 63 (1985) (citations omitted). The "clearly articulated" state policy requirement is not satisfied "when the State's position is one of mere *neutrality* respecting the municipal actions challenged as anticompetitive." *Cmty. Communications Co. v. City of Boulder*, 455 U.S. 40, 55 (1982). In *City of Boulder*, the Court held that the *Parker* doctrine did not protect a municipality's regulation of the cable television market, even if the city's activities were authorized by a home rule statute, because the "general grant of power to enact ordinances" did not imply "state authorization to enact specific anticompetitive ordinances." *Id*. at 56. On the basis of this rationale, the TSSAA should not receive antitrust immunity. The Tennessee General Assembly has done nothing more than delegate to the State Board of Education the general authority to develop policies for the operation of public schools. Tenn. Code Ann. § 49-1-302. The state statute says nothing about interscholastic athletics or the TSSAA itself, which acts under the auspices of the Board. *See Brentwood Acad.*, 531 U.S. at 292-93. The Tennessee statue represents a vague, neutral authorization by the sovereign; this is not enough to establish a "clearly articulated and affirmatively expressed" state anticompetitive policy. *Midcal Aluminum*, 445 U.S. at 105; *see also Mich. Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002) ("Grants of general or neutral authority to govern local affairs will not satisfy the 'clear articulation' component of the state action exemption from antitrust liability.").

Other Supreme Court precedent, however, suggests that "'explicit authorization' by state legislatures to displace competition [is] not necessary to pass the clear articulation test. The *Parker* exemption applies as long as the suppression of competition is the foreseeable or logical result of what the state authorizes." *Id*. at 535 (citing *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 42-44 (1985)). In *Town of Hallie*, a city refused to supply sewage treatment facilities to those outside the city's borders. 471 U.S. at 37. The state statute did not refer to competition, but it authorized the city to refuse to provide sewage treatment to adjacent unincorporated areas unless they agreed to annexation. *Id*. at 41. The Court held that "anticompetitive effects logically would result from this broad authority to regulate" and thus the first prong of the *Midcal Aluminum* test was met. *Id*. at 42. *Town of Hallie* is distinguishable, however, since although the state statute in that case did not explicitly authorize anticompetitive state behavior, it specifically described and authorized the policy in question. Here, not only does the Tennessee statute fail to authorize anything like the recruiting rule or any other regulation, but it also fails to mention interscholastic athletics at all. The state as sovereign has not made clear its intent to establish an anticompetitive regulatory program. *Cf. S. Motor Carriers Rate Conference,* 471 U.S. at 63-64 ("The legislature thus made clear its intent that intrastate rates would be determined by a regulatory agency, rather than by the market."); *Mich. Paytel*, 287 F.3d at 536 (holding that anticompetitive effects are "the logical and foreseeable result of the City's broad authority under state law and the Michigan Constitution to bid out public contracts for the maintenance of City prisons").

Assuming, *arguendo*, that the TSSAA acts pursuant to a "clearly articulated and affirmatively expressed" anticompetitive state policy, the next question is whether its regulatory program is actively supervised by the state. *See Midcal Aluminum*, 445 U.S. at 105.[25] This court

---

[25] A threshold question before reaching this second prong of the test is whether the second prong applies to the TSSAA. *Town of Hallie* stands for the proposition that the active state supervision requirement is not applicable in cases where the actor is a municipality, and the Court suggested in dicta in that case that the same should go for cases in which the actor is a "state agency." *See* 471 U.S. at 46, 46 n.10. In their brief, defendants cite a number of cases to support their argument that the TSSAA qualifies as a political subdivision of the state for antitrust purposes and therefore need

has held that the active supervision requirement must be met by state supervision; "municipal oversight" of the program is insufficient. *See Riverview Invs., Inc. v. Ottawa Cmty. Improvement Corp.*, 774 F.2d 162, 163 (6th Cir. 1985). Significantly, this court has also held that antitrust immunity does not apply to a private actor to whom authority is delegated such that the private actor becomes the "effective decision maker." *See Mich. Paytel*, 287 F.3d at 537-38. In these situations, when a private actor (such as a non-profit corporation) acts on behalf of the state but makes "'independent decisions without the input, advice, involvement, or oversight of...any...governmental body,'" antitrust immunity does not apply. *Id*. at 538 (quoting *Riverview Invs., Inc. v. Ottawa Cmty. Improvement Corp.*, 899 F.2d 474, 481-82 (6th Cir. 1990)); *see also Town of Hallie*, 471 U.S. at 47 ("Where a private party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State."). Here, authority was clearly delegated from the state to the State Board of Education and then, in turn, to the TSSAA. There is nothing at all in the record to indicate that the state is actively involved in supervising the TSSAA. In fact, the evidence suggests that the opposite is the case. *See also Midcal Aluminum*, 445 U.S. at 106 ("The national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement.").[26]

Defendants therefore cannot establish either prong of the *Midcal Aluminum* test. For these reasons, we reverse the district court's October 2002 decision finding that the TSSAA is entitled to *Parker* antitrust immunity and remand for further proceedings with respect to Brentwood's antitrust claim.

### G. Relief Issues

Brentwood also appeals the district court's denial of damages. "[W]hen § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 (1986). "[P]roximate causation is an essential element of a § 1983 claim for damages. That is, a violation of a federally secured right is remediable in damages only upon proof that the violation proximately caused injury." *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 659 (6th Cir. 1994) (internal citation omitted). The district court found that the damages claimed by Brentwood (reputational harms and time spent by employees on the case) were not proximately caused by the defendants. On appeal, Brentwood argues that the district court should have considered whether the damages were "foreseeable" and that the harms suffered by Brentwood were foreseeable consequences of the defendants' conduct.

---

not meet the second prong of the *Midcal Aluminum* test. However, none of these cases concern an athletic association such as the TSSAA, and defendants cite no case from this circuit to support their argument. In fact, circuit precedent suggests that it is only municipalities that are exempt from the second prong of the test. *See Mich. Paytel*, 287 F.3d at 536 (holding that "private parties must establish both" elements of the *Midcal Aluminum* test).

[26]The dissent rests its differing result on our decision in *Consolidated Television Cable Service, Inc. v. City of Frankfort*, 857 F.2d 354 (6th Cir. 1988). Based on the ruling in that case, it concludes that the TSSAA is the agent of the Tennessee Board of Education, itself a state agency, and that the TSSAA need only meet the state antitrust immunity test for state political subdivisions. The relationship between the municipality and its agent cable television company in *Consolidated*, however, is not analogous to the relationship between the Board and the TSSAA. Frankfort provided cable television service to its citizens and owned the system for providing the service, created the cable company to operate the system, and exercised continued supervisory control over the cable company – described by the court as "ultimate control." *Id*. at 358. In fact, Consolidated itself had previously described the cable company as an agent of the municipality, a fact which the court mentioned as *dicta* but which nevertheless appears important to the resolution. The TSSAA, with its mix of public and private membership and revenue, its elaborate internal governance and appeal structure, and its lack of state supervision does not fit within the cable company model described in *Consolidated*.

The district court rightly pointed out that any costs incurred by Brentwood as a result of the litigation were costs it chose to incur when it filed the case. As to Brentwood's reputational damage, foreseeability is an element of the proximate cause analysis, but it is distinct from the requirement that a plaintiff show the injury was directly caused by the defendant. *See Perry v. Am. Tobacco Co.*, 324 F.3d 845, 850-51 (6th Cir. 2003). It is a fundamental tort law principle that while an injury to a plaintiff might be foreseeable, the damages incurred could still be "too remote to permit recovery." *See, e.g., Laborers Local 17 Heath & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 236 (2d Cir. 1999). Here, the district court sensibly concluded that even if Brentwood's reputational harms were foreseeable, they could be traced much more directly to the media and other third-party actors than to the TSSAA or Carter.

Brentwood also argues that the district court, which enjoined the penalties assessed against Brentwood, should have also enjoined the enforcement of the recruiting rule "as applied to speech more generally." Brentwood asserts in its brief that "[o]nly a decision-forcing injunction against applying the [recruiting rule] to speech can assure TSSAA's First-Amendment-mandated 'careful calculation of the speech interests involved.'" These arguments are not well-taken. In its previous opinion, this court clearly rejected a facial challenge to the recruiting rule based on an argument that the regulation was invalid in all of its applications. *Brentwood Acad.*, 262 F.3d at 554-57. The court suggested that the recruiting rule could in fact be applied constitutionally in some cases, and the district court's task on remand was to consider only whether the rule was constitutional as applied to Brentwood. *Id*. at 554-58. The district court correctly limited its remedy accordingly and enjoined only the application of the rule to Brentwood in this case.[27] We affirm the remedy granted by the district court.

## III.

For the foregoing reasons, we: (1) affirm those parts of the district court's decision finding for Brentwood on its First Amendment and procedural due process claims and granting injunctive relief on these claims; (2) reverse the district court's decision finding for Brentwood on its substantive due process claim; (3) reverse the district court's decision finding that Carter is not entitled to qualified immunity; (4) reverse the district court's order finding that the TSSAA is entitled to antitrust immunity; and (5) remand for further proceedings on Brentwood's antitrust claim.

---

[27]In its brief, Brentwood argues that the district court's injunction should also be directed at Carter in his official capacity. It is unclear why Brentwood makes this argument or why this should be the case, as the injunction enjoins all of the penalties imposed by the TSSAA against Brentwood. The injunctive relief was thus complete.

---

**DISSENT**

---

ROGERS, Circuit Judge, dissenting.

High school football is a game.  Games have rules.

To have federal courts, under the guise of applying the enduring principles of the First Amendment, reverse the ordinary application of high school football recruiting rules—where the core values of the Amendment are not even remotely involved—unduly trivializes these constitutional principles.  This is no more a case involving our nation's ideal of freedom of expression than a case involving a coach who is thrown out of a game for talking back to a referee. This is instead a case involving game participants who challenge the discretionary administration of participation rules.  Of course, good lawyers can characterize almost any perceived injustice as a constitutional case (and maybe even an antitrust case to boot), but courts should be hesitant to go along.

The Supreme Court has properly instructed us in this case that the defendant is a state actor for constitutional purposes, and this court in its 2003 decision properly determined that Brentwood Academy did not contract away all of its constitutional rights by joining TSSAA.  If, for instance, TSSAA discriminated on the basis of race or religion or the expression of political views, the earlier court holdings in this case would insure the availability of federal court relief.  But here TSSAA is clearly doing nothing more than administering its game rules—the game being interschool high school football. Dissatisfaction with application of game rules does not become a First Amendment violation merely because the rule involves speech.

Recruiting and eligibility rules are of course a very real part of the game itself, protecting the student-athlete and the brand of competition agreed to.  The game of football, like any game, has rules which the competitors accept as an inherent part of participation.  In addition to the basics of the game, such as how many players may participate at one time and how many points are awarded for a touchdown, competitors agree on further rules governing competition more broadly, agreeing on rules that govern how teams are grouped into leagues, how the champion of the league is determined and who is eligible to participate in a game. Fierce competition among high schools for talented student athletes, and the demand for success from fans and alumni, bring the potential for excess.  As a result,  athletic leagues comprised of educational institutions, such as TSSAA, have rules governing both the recruitment of student-athletes and the eligibility of student-athletes to participate in athletic contests.  Anti-recruiting rules may inhibit "speech," but so do the ordinary rules of a football game that allow players and coaches to be removed for disputing the propriety of a referee's call.

Accordingly, I dissent from those portions of the majority's decision upholding plaintiff's First Amendment claims.  I also dissent from the finding of a due process violation and from the decision to reverse the district court's determination that there is no basis for antitrust liability in this case.[1]

---

[1] I concur in Part II.C. of the majority opinion rejecting Brentwood's substantive due process claim.

I.

While the insubstantiality of plaintiff's First Amendment claim is clear, the complexities of modern First Amendment jurisprudence make it less clear precisely why the claim is not substantial. There are two parts to the answer. First, ordinary enforcement of game rules does not amount to an unconstitutional limit of free expression in part because participants agree to play in the games. Second, ordinary enforcement of game rules does not amount to an unconstitutional limit on free expression because rules (including rules limiting speech) are inherently necessary to ordered competition. Of course these two ideas substantially overlap, but they find expression in different strands of First Amendment law. Both strands reflect the underlying idea that rules have value for the sake of being rules, and only trench on First Amendment concerns when their relationship to the game is too attenuated. Enforcement of the recruitment rule in this case is clearly warranted because Brentwood agreed to general applicability of the rules (although not to rules that draw distinctions unrelated to the purpose for the rules, such as interpretations of the rules that discriminate, for example, on the basis of political party affiliation). Enforcement of the recruitment rule in this case is also clearly warranted because, in the context of athletic competition, the rule is sufficiently related to legitimate public interests and narrowly tailored. Under each of these arguments, and certainly under at least one of the two, there is no First Amendment violation in this case.

I recognize that the first argument is subject to the criticism that it ignores our earlier 2001 decision and renders the extensive district court proceedings on remand an exercise in futility. In addition, the second argument is subject to the criticism that it does not adequately defer to the factual findings of the district court. While I am sympathetic with the inclinations undergirding these arguments, I cannot in the end accept that they compel us to affirm the finding that enforcement of an unexceptional athletic anti-recruiting rule violates the First Amendment.

A.

First of all, Brentwood agreed to comply with TSSAA anti-recruiting rules, and thus gave up its right to engage in some expressive activity otherwise protected by the First Amendment. That is not to say that it gave up all of its rights to engage in expressive activity vis-à-vis TSSAA. But it obviously gave up some. By comparison, a person by accepting employment by the government gives up some rights protected by the First Amendment (e.g., the right to read the newspaper all day long), but does not give up all First Amendment rights (e.g., the right to talk politics during a break).

Brentwood in this case gave up its right to engage in certain types of speech, and may not assert such a right now. *See Leonard v. Clark*, 12 F.3d 885, 889-90 (9th Cir. 1993) (affirming the district court's decision not to reach the issue of whether a labor union's free speech rights had been violated where the district court had first determined that the union waived its First Amendment protections in a collective bargaining agreement). Brentwood in short gave up its right to speak in violation of TSSAA's game rules (including its anti-recruiting rules) as consideration for access to TSSAA leagues and tournaments, and to benefit from TSSAA's enforcement of its rules against competitors.

*1.    Free Speech Rights May Be Given Up*

Most individually held constitutional rights may be waived, if done knowingly, intelligently, and with sufficient awareness of relevant circumstances and likely consequences. *See Brady v. United States*, 397 U.S. 742, 748 (1970) (recognizing waiver of the constitutional right to a trial in a criminal case); *Leonard*, 12 F.3d at 889-90 (upholding a contractual waiver of First Amendment rights where it was knowing, voluntary, and intelligent); *Erie Telecomms. v. Erie*, 853 F.2d 1084, 1096 (3d Cir. 1988) ("constitutional rights, like rights and privileges of lesser importance, may be contractually waived where the facts and circumstances surrounding the waiver make it clear that

the party foregoing its rights has done so of its own volition, with full understanding of the consequences of its waiver").

The power to waive individually held constitutional rights extends to First Amendment speech-related protections. The Supreme Court has repeatedly held that contractual waivers of free speech protections may be judicially enforced. In *Snepp v. United States*, the Supreme Court held that the Central Intelligence Agency (CIA) was not barred by the First Amendment from enforcing an employment agreement that required CIA employees to get its permission before publishing writings about agency activities. 444 U.S. 507, 507-511 (1980). The Court upheld this prior restraint on speech in part because the CIA employee in that case had voluntarily signed the employment agreement. *See id.* at 510-11. Similarly, in *Rust v. Sullivan*, the Court upheld the federal government's restriction on the abortion-related speech of staff members working for doctors receiving Title X funds. 500 U.S. 173 (1991). The Court upheld this restriction because it was "a consequence of [the staff members'] decision to accept employment." *Id.* at 199.

The Third, Fourth, and Ninth circuits have also honored contractual waivers of First Amendment rights contained in contracts with state actors. *Erie Telecomms.*, 853 F.2d at 1094-98 (upholding a cable company's waiver of First Amendment rights in a franchise agreement with a city); *Lake James Cmty. Volunteer Fire Dep't., Inc. v. Burke County,* 149 F.3d 277, 280-82 (4th Cir. 1998) (holding enforceable a Fire Department's "limited waiver" of some First Amendment rights in a contract with a county government); *Leonard*, 12 F.3d at 889-92 (upholding a labor union's waiver of some First Amendment rights to a city as provided in a collective bargaining agreement).

While these cases demonstrate that constitutional rights can be bargained away, they do not begin to cover all the possibilities. Some constitutional rights are so obviously alienable that no one would challenge the idea. To become a prison guard, a person may give up the right to be out of the prison premises for eight hours a day. To become a judge, a person may give up the right to solicit charitable contributions. To become a flight attendant, a person may give up the right to refrain from speaking before the plane takes off. And so on. Again, this is not to say that such persons give up all free expression rights, but they certainly give up some.

### 2.     *Brentwood Gave Up its Right to Certain Speech*

In this case Brentwood gave up some of its free speech rights when it signed a one-year contract agreeing to abide by TSSAA's game rules, including its anti-recruiting rules. Brentwood's promise is not materially different from the CIA's employment agreement or the speech restrictions on the *Rust* staff employees. In each of these situations, the promisors agreed not to speak in certain ways in return for something they desired.

Brentwood's waiver was doubtless knowing, voluntary, and intelligent. The anti-recruiting rule and supplemental materials explicitly forbade Coach Flatt from "contact[ing] a student or his or her parents prior to his enrollment in the school." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 262 F.3d 543, 549 (6th Cir. 2001). Nothing could be clearer, and Coach Flatt did exactly this. His waiver—and his violation of this crystal clear rule—were voluntary, knowing, and intelligent. Moreover, there is no evidence on the record that would suggest that Brentwood had agreed to TSSAA's rules involuntarily or without knowledge. That Brentwood, a sophisticated and tenacious party, never contested in this appeal that it understood the anti-recruiting rules tells volumes about the intelligence of its waiver.

### 3.    *Brentwood's Waiver Has No Unconstitutional Conditions Doctrine Defect*

Brentwood's waiver does not run afoul of the "unconstitutional conditions" doctrine because the anti-recruiting rules relate to participation in TSSAA athletics and Coach Flatt's recruiting letter and follow-up phone calls do not bear on matters of public concern.

"Under the well-settled doctrine of 'unconstitutional conditions,' the government may not require a person to give up a constitutional right . . . in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the" right surrendered. *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994) (citing *Perry v. Sindermann*, 408 U.S. 593 (1972); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). When the free speech rights of government employees are at issue, this doctrine prevents the surrender of speech rights only if the speech bears on some matter of public concern. *Connick v. Myers*, 461 U.S. 138, 146 (1983).

In this case the unconstitutional conditions doctrine will invalidate Brentwood's waiver only if Brentwood's membership in TSSAA has "little or no relationship" to the free speech rights surrendered (i.e., to the anti-recruiting rules); or if, applying the *Connick* standard, Coach Flatt's recruiting speech bore on a matter of public concern.

The anti-recruiting rules relate to participation in TSSAA and limit no speech on any matter of public concern. By limiting Coach Flatt's right to recruit unenrolled middle-school students for the football team, the anti-recruiting rules regulate the formation of teams that compete in TSSAA. It is an off-the-field regulation thought to enhance the quality of on-the-field competition by promoting equity in the relative strength of teams. The anti-recruiting rules, therefore, have a clear relationship, not "little or no relationship," to participation in TSSAA. Obviously, there is no reason to think that Coach Flatt's recruiting letter or follow-up phone calls touch upon any matter of public concern under *Connick*. Consequently, there is no unconstitutional conditions doctrine defect in Brentwood's agreement to comply with recruitment rules.

There is no reason to limit the *Connick* no-public-concern analysis strictly to government employee cases. *Connick* is analogous because the restriction on Brentwood's recruiting speech emanates from the necessity of limiting game participants' speech as part of the competitor-referee relationship. *Cf.* Maj. Op. at 8 (observing that lawful restrictions on government employees' speech emanate from the necessity of limiting their speech as part of the employer-employee relationship). The operation of a sports league demands speech limits that are germane to the agreed-upon venture no less than does employment. To extend an earlier analogy, a government employee harms the employer-employee relationship when he exercises his First Amendment right to read the newspaper for his entire workday. Likewise, Coach Flatt harmed the competitor-referee relationship between Brentwood and TSSAA when he disobeyed anti-recruiting rules that others were presumably following.

Brentwood's promise to follow the anti-recruiting rules has no unconstitutional conditions doctrine defect because it has a relationship to Brentwood's participation in TSSAA and limits no speech of public concern. Brentwood's First Amendment claims should be dismissed.

### 4.    *Our 2001 Opinion Leaves Open the Possibility That Brentwood Gave Up Those Free Speech Rights That Might Interfere With TSSAA Game Rules*

In my view, this court's 2001 opinion does not at all foreclose the foregoing argument. *Compare* Maj. Op. at 7; *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 262 F.3d 543, 550 (6th Cir. 2001). The 2001 opinion on the contrary rejected a different and overly broad theory of waiver: that Brentwood had given up its right to sue entirely. *See id.* The 2001 opinion noted that

the cases cited by TSSAA in support of this overly broad waiver theory involved parties that had explicitly "waived their right to *sue*," and concluded that "[t]here is no comparable TSSAA provision prohibiting members from *challenging the constitutionality* of the recruiting rule." *Id.* (emphasis added). In other words, the 2001 opinion says only that Brentwood did not waive its right to sue *generally*. That is true. While retaining its right to sue generally, Brentwood waived a more limited group of rights—including any free speech-related theories that would invalidate the normal administration of rules that Brentwood agreed to, including the anti-recruiting rules. Brentwood could for instance sue on the basis of the unconstitutional conditions doctrine and indeed this court relied upon such cases in our rejection of the blanket waiver argument. *See id.*

By analogy, the staff personnel in *Rust* did not waive their right to sue about their employment conditions or free speech rights generally. Surely a court could have heard a political discrimination claim brought against the government funding authority by any such staff members. Yet the Court still held that the staff members, by accepting employment, waived First Amendment objections to Title X's abortion-speech restrictions. *See Rust*, 500 U.S. at 199 ("employees' freedom of expression is limited during the time that they actually work for the project; but this limitation is a consequence of their decision to accept employment in a project, the scope of which is permissibly restricted by the funding authority"). In this case, Brentwood waived only speech rights that would interfere with its agreement to abide by TSSAA's game rules and that did not violate the unconstitutional conditions doctrine.

The 2001 opinion never addressed this narrower theory of waiver and thus does not foreclose any and all arguments based on waiver. Brentwood waived its right to have Coach Flatt contact as yet unenrolled students. Its First Amendment claim should be dismissed on that ground.

B.

While our previous decision did not foreclose the above argument, it did direct the lower court to apply the test for content-neutral speech restrictions, and I certainly respect the majority's reluctance to disregard the district court's extensive factual inquiry. In my view, however, none of the district court's factual findings are sufficient to warrant the legal conclusion that Brentwood's First Amendment rights were violated by TSSAA's enforcement of the anti-recruiting rules. The very nature of game rules requires that they be somewhat arbitrary. If upon remand the district court had found a restriction on speech of a public concern, or a restriction on speech unrelated to the game of football, our review of the district court's conclusion might support affirmance. Nothing like that was found in this case.

In this case, TSSAA's game-related legitimate interests in subordinating athletics to academics, preventing the exploitation of middle school student-athletes, and furthering competitive equality of teams, together fully justify the enforcement of the anti-recruiting rules against Brentwood. The anti-recruiting rules are reasonable time, place or manner restrictions on speech that are narrowly tailored to serve a significant government interest and leave open alternative channels of communication. *See Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989); *Tucker v. City of Fairfield*, 398 F.3d 457, 463-64 (6th Cir. 2005). The anti-recruiting rules, as applied to Coach Flatt for the spring practice letter and the follow-up phone calls, are narrowly tailored. The rule by its terms is limited to contacts "to secure or to retain a student for athletic purposes . . . ." The rule also leaves open alternative channels of communication. Coach Flatt could have distributed recruiting letters to private athletic leagues not affiliated with any school system near Brentwood's geographic area, or he could have distributed such materials to the administration of any public or private school with a request that those schools give them to students. The rule expressly endorses another alternative channel: potential students who on their own initiative contact the coaching staff seeking enrollment or financial aid information may be referred to Brentwood's principal, admissions department, guidance department, or the person in charge of financial aid.

The majority relies extensively on the required "roadmap" of our previous opinion in this case, but following that roadmap leads directly to the conclusion that there is no First Amendment violation. We held, in approximately one page of analysis, that the anti-recruiting rules amount to a content-neutral regulation subject to intermediate scrutiny. 262 F.3d at 553-54 (Part D). We also held, in another page of analysis, that the district court on remand should determine if the anti-recruiting rules are narrowly tailored to meet TSSAA's substantial interests. *Id.* at 557-58 (Part F).

Repeatedly cited in those two pages are the adult entertainment ordinance case of *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), and the New York rock concert case of *Ward v. Rock Against Racism*, 491 U.S. 781 (1989). Under the indisputably applicable analysis of those cases, it is not possible to find a First Amendment violation on the primary factual findings of the district court in this case.

The zoning ordinance at issue in *Renton* prohibited the location of adult theatres within 1000 feet of any residential zone, single- or multiple-family dwelling, church, park, or school. 475 U.S. at 43. The Court held that the ordinance was to be evaluated under the test for content-neutral time, place, and manner restrictions on speech. *Id.* at 46-50. This is the test that we previously held to be applicable to the particular anti-recruiting rules in this case. The test is whether the ordinance "is designed to serve a substantial governmental interest and allows for reasonable alternative means of communication." *Id.* at 50. The Court upheld the ordinance, ruling that the City could rely on the experiences of other cities "so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *Id.* at 51-52. The Court rejected arguments that the ordinance was underinclusive or that it did not allow reasonable alternative means of communication.

Similar analysis compels a rejection of Brentwood's First Amendment claim. In First Amendment jargon, TSSAA is attempting to regulate the negative secondary effects of Brentwood's speech: the exploitation of middle school athletes, the subordination of academics to athletics, and unevenly matched teams. The district court recognized the validity of these interests. 304 F. Supp. 2d at 994. TSSAA has furthered these interests by restricting communication between the coach and a student prior to enrollment, just as many cities have restricted the erotic message of dancers by keeping it away from residential areas and churches. In both cases, the negative secondary effects are controlled by restricting the time and the nature of the messages a speaker may convey. In the context of a content neutral, time, place, or manner ordinance regulating adult oriented businesses, "[t]he First Amendment does not require a city, before enacting . . . an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *Renton*, 475 U.S. at 51-52. "*Renton* . . . does not require a 'city to demonstrate[,] ... with empirical data, that its ordinance will successfully lower crime', at least 'not without actual and convincing evidence from plaintiffs to the contrary.'" *Baby Dolls Topless Saloons, Inc. v. City of Dallas*, 295 F.3d 471, 481 (5th Cir. 2002) (quoting *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002) (plurality opinion)). Under *Renton*, an ordinance regulating adult oriented businesses is valid so long as a city reasonably concludes that the time, place or manner restriction will be effective in curtailing the negative secondary effects of the businesses; empirical proof that the regulation is effective in lowering prostitution or crime in the case of every establishment affected by the ordinance is not required. *See Alameda Books*, 535 U.S. at 438-39.

It is not right to say that because the parents in this case were happy to receive the letter and that there was no exploitation of students or subordination of academics in this particular case, TSSAA has relied on "shoddy data or reasoning" that does not "fairly support [its] rationale" for the enforcement of the anti-recruiting rules against Brentwood. *Compare* Maj. Op. at 15 (quoting *Alameda Books*, 535 U.S. at 438). Applied to an adult oriented business, such reasoning would

allow the owner of an adult business to mount an as-applied First Amendment challenge to a zoning ordinance if she could show that there were no negative secondary effects, such as prostitution or crime, at *her* establishment. Such is not the state of the law. The anti-recruiting rules, like restrictions on an adult oriented business, operate in the aggregate and are judged based on the overall effect on speech; a city is not required to show that every cabaret affected by an ordinance causes an increase in crime and prostitution before the ordinance can be applied to that business. The aggregate overall increase in crime from an adult oriented business is sufficient to force the operators of those businesses to disperse or congregate. Similarly, TSSAA is not required to demonstrate that each time it enforces the anti-recruiting rules it is stamping out the exploitation of student athletes or the bending of academics to the will of athletics for the anti-recruiting rules to be valid. It is sufficient that, in the aggregate, contact between an authority figure such as a coach and a potential student-athlete may lead to the exploitation of student athletes or the subordination of academics to athletics to justify restricting contact between coach and potential student. All TSSAA must show is that it had a reasonable belief that contact between a coach and a prospective student had the potential for abuse in order to restrict such contact, so long as alternative avenues to communicate the message are left intact. The record here shows such a reasonable belief.[2]

Moreover, the anti-recruiting rule as applied to Brentwood is narrowly tailored and leaves Brentwood alternative channels to communicate its message. Communications not for athletic purposes are of course permitted. Moreover, had the spring practice letter been distributed to representatives of private sports leagues near Brentwood, school administrators of other schools with a request for distribution, or students who on their own had contacted appropriate Brentwood officials, there would be no violation of the anti-recruiting rules.[3]

The as-applied nature of the district court's inquiry does not require a different conclusion. A rule that precludes coach contact with not-yet-enrolled incoming students cannot be constitutional on its face if the underlying purposes of the rule have to be demonstrated every time the rule is applied in order to survive an as-applied challenge. Otherwise there would be no basis for having the rule. Just as the City of Renton does not have to show ill-effects from each proposed adult theatre placement in order to enforce its rule, and just as New York in the *Ward* case does not have to show ill effects each time it requires a band to use city provided sound technicians, TSSAA does not have to show ill effects each time it punishes coach contact with not-yet-enrolled students.

This conclusion is further supported by the traditional deference given to educators in carrying out policies that affect First Amendment rights. This dispute arises in the context of high school education, and the courts have consistently given great deference to educators' decisions that

---

[2]The majority makes the remarkable observation that TSSAA provided no "evidence to support the notion that ensuring that high schools compete in interscholastic sports in an equitable manner is a substantial state interest," and no evidence "explaining why competitive equity is an important value." Maj. Op. at 12. Presumably the City of Renton need not provide evidence for the obvious proposition that crime increases are against the public interest, and New York in the *Ward* case need not provide evidence that appropriate modulation of band concerts is in the public interest. Similarly, it can hardly be argued that TSSAA needs to provide evidence for the obvious proposition that more evenly balanced high school football matches are in the public interest.

[3]The majority opinion also discounts the interpretive commentary accompanying the anti-recruiting rules as non-binding to find that the anti-recruiting rules are not narrowly tailored and burden substantially more speech than necessary. Maj. Op. at 13. Thus, the majority avoids the fact that Brentwood was punished for behavior specifically cited as examples of conduct that would violate the anti-recruiting rules. The commentary to the anti-recruiting rules is non-binding only to the extent that TSSAA has a certain amount of discretion in enforcing the rule, and the examples cited in the interpretive commentary are a non-exclusive list. The discretion vested in TSSAA under the anti-recruiting rules is not so broad that the anti-recruiting rules, despite content neutrality, become a de facto prior restraint on speech. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988) (no standards for denial or grant of permit for newsrack on public property); *Cantwell v. Connecticut*, 310 U.S. 296 (1940).

have an impact on First Amendment rights. The Supreme Court has recognized the "important, delicate, and highly discretionary functions" that the educational system undertakes, and emphasized a consistent concern for "the need [to] affirm[] the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969). As this court has stated, "In the First Amendment arena . . . the Supreme Court . . . has frequently emphasized that public schools have considerable latitude in fashioning rules that further their educational mission and in developing a reasonable fit between the ends and means of their policies." *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 393 (6th Cir. 2005). While not a public school, TSSAA is a part of the educational system that regulates what both parties concede is an important part of the high school experience. TSSAA should enjoy greater latitude in fashioning and applying recruiting rules that prescribe and control the conduct of overzealous coaches to further its educational mission, consistent with fundamental constitutional safeguards.

The Supreme Court and our court have both recognized that the federal courts are ill-equipped to regulate high school education. "It long has been the case that constitutional claims generally receive less rigorous review in the secondary and middle school setting than they do in other settings." *Id*. Federal courts are even less well-equipped to regulate high school athletics.

Finally, I note the "Catch-22" implication of the argument that the particular application of the anti-recruiting rules violated the First Amendment in this case. By prohibiting all communication between coaches and unenrolled students, the regulation is more rigorously content neutral. The more the prohibition is "tailored," for instance by permitting some types of communication but not others, the less content neutral it becomes. An attack on the particular application of the no-communication rule thus gives TSSAA the Hobson's choice of (1) making the prohibition more content specific, thereby coming closer to treading on First Amendment values, or (2) discarding the rule—not required if the rule is facially valid.

II.

Brentwood's procedural due process rights were not violated because the presentation of ex parte evidence, if any, did not affect TSSAA's final decision.

Based on TSSAA's written decision and the testimony at trial, the district court clearly erred in determining that the TSSAA Board of Control heard ex parte evidence related to Bart King during its deliberations following Brentwood's final hearing, and that the allegations regarding Mr. King were a basis for the penalty imposed. The only support for the district court's finding that the King allegations were a basis for Brentwood's punishment are two statements by TSSAA Board of Control President Mike Reed. In his deposition, Mr. Reed stated that the King allegation was one of the reasons Brentwood was found to have violated the anti-recruiting rules. At trial, Mr. Reed disclaimed his deposition testimony, stating that Brentwood's final penalty was due to Coach Flatt's letter rather than Mr. King's activities. He went on to state that the Bart King allegations were a "factor" in "what was going on and so forth," interrupting Brentwood's counsel before the follow up question was finished.

With all due respect to the district court's better position to judge the credibility and demeanor of witnesses, the district court clearly erred in determining that Mr. Reed's single statement at deposition was sufficient to show that ex parte evidence was presented to the Board of Control and formed a basis for the penalty imposed on Brentwood. Michael Hammond and Ronnie Carter, in addition to Mr. Reed, testified that the King allegations were not a basis for the final penalty. Mr. Hammond further indicated that the discussion of the King allegations during the Board of Control's private deliberations was superficial. Gene Meness and Bernard Childress, the TSSAA investigators who looked into the King allegations, could not recall answering any question

from the Board of Control related to Mr. King. Indeed, it is unclear what evidence they could have presented given that they did not interview Mr. King and the investigation consisted of a series of letters between Brentwood's headmaster and TSSAA. In short, other than a single statement in a lengthy deposition, there is no evidence that TSSAA based its final penalty on ex parte evidence related to Bart King and the district court clearly erred in resting the entire weight of its finding that Brentwood's procedural due process rights were violated on so slender an evidentiary reed.

III.

Finally, the fact that TSSAA has been granted state authority to regulate athletic competition requires us to affirm the district court's conclusion that state antitrust immunity applies in this case. TSSAA is entitled to state antitrust immunity because, as an agent of the Tennessee Board of Education (the Board), TSSAA partakes of the Board's state authorization to displace competition. TSSAA has done so using foreseeable means pursuant to clearly articulated Tennessee policy. As a result, TSSAA satisfies the applicable test for state antitrust immunity designed for municipalities and state political subdivisions. I would therefore affirm the decision of the district court granting summary judgment in favor of the TSSAA on Brentwood's antitrust claims based on state antitrust immunity.

A.      *TSSAA is the Tennessee State Board of Education's Agent*

TSSAA is an agent of the Board and, as such, receives state antitrust immunity if it satisfies the test for municipalities or state political subdivisions. Our ruling in *Consolidated Television Cable Service, Inc. v. City of Frankfort* indicates that TSSAA is an agent of the Board. 857 F.2d 354 (6th Cir. 1988). In that antitrust suit, we held that a municipal cable television corporation (that obviously was not itself a city) was an agent of the City of Frankfort and thus should receive state antitrust immunity if it satisfied the test for municipalities. *Id.* at 358-60. We classified the corporation as the City's agent because the City exercised "ultimate control" over the corporation. *Id.* at 359.

More specifically, the City had "ultimate control" over the corporation because (1) it was a municipal corporation; (2) the corporation's form and method had been dictated by the City; (3) the corporation existed at the City's pleasure; (4) and the City appointed one half of the corporation's board of directors. *See Consolidated*, 857 F.2d at 358-59.

Analogously, the Board exercises "ultimate control" over TSSAA. The Board enjoys ultimate control over TSSAA because the Board delegated to TSSAA all of TSSAA's regulatory powers and therefore can revoke its authority at any time. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 13 F. Supp. 2d 670, 679-81 (M.D. Tenn. 1998). The Board wields a general power to review, approve, or reaffirm the content of TSSAA's regulations. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 292-93, 299-301 (2001). At its whim, the Board can revoke any TSSAA rule it dislikes. *See id.* The Board's review power implicitly disciplines TSSAA. *See id.* Moreover, the Board's chairman has power to designate a person or persons to serve in an ex-officio capacity on TSSAA's governing bodies. *Id.* at 292. The Board may thus directly influence TSSAA's most minute decisions by populating its decision-making bodies with people of its selection. The Board's complete dominion over TSSAA is "ultimate control" under *Consolidated*, making TSSAA the Board's agent.

B.       *The State Antitrust Immunity Test for Municipalities and State Political Subdivisions Applies to TSSAA's Allegedly Anticompetitive Conduct*

Because TSSAA is the Board's agent, and the Board is a state agency, TSSAA need only satisfy the state antitrust immunity test for municipalities or state political subdivisions, not the more stringent test for private actors. *See Consolidated*, 857 F.2d at 359-62 (applying the test for municipalities to an agent of a municipality). In *Consolidated* we read *Town of Hallie v. City of Eau Claire*, 471 U.S. 34 (1985), clearly to hold that the requirement of "active supervision" applied "only when the actor is a private party rather than a municipality." *Consolidated*, 857 F.2d at 360. The test for municipalities and state political subdivisions allows TSSAA to act anticompetitively pursuant to "clear articulation of a state policy to authorize anticompetitive conduct." *See Town of Hallie*, 471 U.S. at 40-42 (internal quotation omitted). Tennessee law need not *explicitly* demand or permit displacement of competition. *See id.* at 41-42. The anticompetitive conduct need only be the "foreseeable result" of state authorization. *Id.* at 42.

C.       *Tennessee's Policy to Displace Competition in Interscholastic Athletics is Evident in Its Broad Grant of Authority to Regulate Interscholastic Athletics*

Tennessee's policy to displace competition in interscholastic sports may be inferred from its grant of authority to the Board. As the Supreme Court has noted, Tennessee law vests in the Board wide-ranging authority to regulate primary and secondary education. *See Brentwood Acad.*, 531 U.S. at 292 (citing TENN. CODE ANN. § 49-1-302). Section 49-1-302 grants broad powers that include the authority to regulate athletics programs; this section further serves as the basis for TSSAA's status as the agency responsible for regulating interscholastic school sports in Tennessee. *See id.* Under the Supreme Court's decision in *City of Columbia v. Omni Outdoor Advertising*, such broad authority to set restrictions on competitive endeavors makes evident the state's policy to displace competition. *See* 499 U.S. 365 (1991).

In *Omni*, the Supreme Court held that state antitrust immunity applied to a city that had used its state-granted zoning authority to restrict billboard construction. *See id.* at 368-79. In holding that state delegation of zoning authority to a city evinces a state policy to displace competition, the Court said: "The very purpose of zoning regulation is to displace unfettered business freedom in a manner that regularly has the effect of preventing normal acts of competition, particularly on the part of new entrants. A municipal ordinance restricting the size, location, and spacing of billboards (surely a common form of zoning) necessarily protects existing billboards against some competition from newcomers." *Id.* at 373. Consequently, the mere delegation of zoning authority to the city adequately evinced a state policy to displace competition.

In this case, the delegation to TSSAA of comprehensive power to regulate interscholastic athletics is the equivalent of the city's grant of zoning authority in *Omni*. Just as the exercise of zoning authority in *Omni* stopped a company from competing in the billboard construction market, TSSAA's anti-recruiting rules restrict schools' efforts to build their best teams by wooing talented players with scholarships or perquisites. In a broader sense, also, TSSAA's potential efforts to determine the venues of games, what teams will face each other, the grouping of schools into divisions, the dates of the athletic seasons or pre-seasons, and any number of other restrictions run the risk of "preventing normal acts of competition" in a manner analogous to the zoning authority in *Omni*. Such regulations are a "foreseeable result" of Tennessee's decision to authorize the statewide regulation of interscholastic sports.

The Supreme Court has impliedly acknowledged the inherent need for rules that "prevent[] normal acts of competition" in the football context. The Court has written regarding the National Collegiate Athletic Association (NCAA):

What the NCAA and its member institutions market in this case is competition itself—contests between competing institutions. Of course, this would be completely ineffective if there were no rules on which the competitors agreed to create and define the competition to be marketed. A myriad of rules affecting such matters as the size of the field, the number of players on a team, and the extent to which physical violence is to be encouraged or proscribed, all must be agreed upon, and all restrain the manner in which institutions compete. Moreover, the NCAA seeks to market a particular brand of football—college football.

*NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 101-102 (1984). These sorts of restrictions, and their anticompetitive effects, are no less foreseeable here.